V. David Rivkin
Gregory F. Hauser
WUERSCH & GERING LLP
100 Wall Street, 10th Floor
New York, New York 10005
Tel. 212-509-5050
Fax: 212-509-9559
john.smitten@wg-law.com
david.rivkin@wg-law.com

*Attorneys for Petitioner*
*Pedro Pidwell as Liquidator of*
*Espirito Santo Financial*
*Portugal, SGPS, SA*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
In Re: Application of Pedro Pidwell for                    Case No. _____
An Order Seeking Discovery from
CENTERBRIDGE PARTNERS L.P., and APOLLO
GLOBAL MANAGEMENT, INC. f/k/a APOLLO
GLOBAL MANAGEMENT LLC
Pursuant to 28 U.S.C. § 1782,
In Aid of a Foreign Proceeding
----------------------------------------------------------x

**DECLARATION OF DR. ANTONIO ALFAIA DE CARVALHO**

I, Antonio Alfaia de Carvalho, pursuant to 28 U.S.C. § 1746, hereby declare under

penalty of perjury under the laws of the United States, as follows:

1.      I am a founding partner at Carvalho Matias & Associados, a Portuguese law firm

with a commercial practice, including litigation and arbitration. I hold a law degree from the

University of Lisbon and was called to the Portuguese Bar in 1971.  I have been in public and

private practice in Portugal for nearly fifty years.

2.      I submit this declaration in support of  the Application of Pedro Pidwell, as

liquidator of Espirito Santo Financial Portugal, SGPS, SA ("ESFP"), pursuant to 28 U.S.C. §

1

1782 for an order to obtain discovery from Centerbridge Partners L.P. and Apollo Global Management, Inc., for use in a foreign proceeding.

3.     The statements herein are based on my personal knowledge of the facts, my familiarity with the proceedings in this case, and based upon documents that I have reviewed in connection with this matter.  My law firm is legal counsel to Rainer Manthey, a bondholder of ESFP.

4.     Applicant is a duly appointed liquidator and administrator of ESFP, an insolvent Portuguese entity and a remnant of what was once the Espirito Santo Group, a 150-year-old Portuguese commercial dynasty that collapsed in 2014 amid a financial crisis and allegations of fraud, accounting irregularities, and money laundering involving its former Chairman, Ricardo Espirito Santo Silva Salgado.

5.     The hub of the Espirito Santo empire was Banco Espirito Santo ("BES"), which was at one time Portugal's second largest bank, which Mr. Salgado also headed until his resignation and arrest in mid-2014.  Since his arrest, Salgado has been charged by Portuguese authorities with over sixty-five criminal offenses, including money laundering and fraud.

6.     Salgado's arrest and the implosion of the Espirito Santo Group uncovered a complex web of companies surrounding the Espirito Santo family which had been used to hide billions of dollars in debt that the group was unable to repay.

7.     In the first six months of 2014, BES lost approximately $4.4 billion.

8.     As BES was bleeding money and the Espirito Santo empire was unraveling in 2014, ESFP held a 45% ownership interest in a holding company called Partran, S.G.P.S, S.A.

("Partran").[1]  The other 55% interest in Partran was owned by Espirito Santo Financial Group, S.A. ("ESFG").   Partran, in turn, owned 100% of the shares of Companhia de Seguros Tranquilidade, S.A. ("Tranquilidade"), one of the largest non-life insurance companies in Portugal.

9.      Thus, in effect, in early 2014, ESFP owned 45% of Tranquilidade, a healthy insurance business that had been valued as recently as March 14, 2014, to be worth approximately €713 million.

Salgado's Shell Game

10.      In early 2014, the main shareholder of ESFG was a company called Espirito Santo Irmãos SGPS, which was wholly owned by Rio Forte Investments SA ("Rio Forte"), which, in turn, was owned by Espirito Santo International S.A. ("ESI").

11.      Prior to its collapse, BES had been selling commercial paper issued by ESI and Rio Forte to its private customers. At the time, ESI and Rio Forte apparently had negative equity. When Banco de Portugal, Portugal's central bank, discovered that such commercial paper was being sold by the bank, it directed ESFG to refund the purchasers of the commercial paper.

12.       Salgado and his accomplices, who controlled both ESFG and BES, arranged for BES to provide a line of credit to ESFG -- ostensibly so that ESFG could pay back the buyers of the commercial paper, as directed by Bank of Portugal.

13.      As "collateral" for this line of credit, Salgado and his accomplices caused Partran, (which as explained above, is owned 45% by ESFP and 55% by ESFG, and is the holding

---

[1] On May 15, 2014 in addition to holding 45% of the share capital of Partran, ESFP's only other asset was a 25.98 % share in BES.

company of 100% of the shares in Tranquilidade) to pledge its shares in Tranquilidade to BES, ostensibly as security for the line of credit extended to ESFG.

14.     There was no consideration paid or benefit conferred to Partran for the pledge of its shares in Tranquilidade to BES, and Partran's board never formally approved this pledge.

15.     ESFG then drew down approximately €48.5 million from the line of credit from BES.

The BES Resolution  and Creation of Novo Banco

16.     In early August 2014, the Portuguese Central Bank ordered the transfer of BES's "healthy assets" to a newly incorporated "good bank" called Novo Banco S.A. ("Novo Banco"), while BES's "toxic assets" would remain with BES, which subsequently entered liquidation.

17.     Part of the "healthy assets" transferred to Novo Banco was the line of credit extended by BES to ESFG, as well as the pledge of the shares in Tranquilidade that Partran granted to BES to secure the line of credit BES issued to ESFG.

18.     ESFG then defaulted on the line of credit by failing to repay the approximately €48.5 million that it had drawn down.  This led to Novo Banco executing on the pledged shares of Tranquilidade and thus becoming the new owner of 100% of Tranquilidade.

19.     As a result, the bondholders of ESFP, who had invested in ESFP precisely because of its valuable holdings in Tranquilidade, were completely wiped out.  The unlawful pledge of Tranquilidade's shares to BES and the subsequent transfer of ownership of Tranquilidade to Novo Banco left ESFP insolvent and the bonds issued by ESFP worthless to ESFP's bondholders and creditors.

Sale of Tranquilidade to Calm Eagle

20.    In early 2014, prior to the Portuguese Central Bank's mandated transfer of BES's healthy assets to Novo Banco, an affiliate of had been negotiating with Apollo Global Management, Inc. ("Apollo"), for one of its subsidiaries or affiliates to acquire Tranquilidade.

21.    During these discussions, Apollo Management VIII, LP, "on behalf of its affiliated investment funds" , on May 23, 2014, made a non-binding offer of approximately €228 million to acquire Tranquilidade, subject to adjustments arising from a detailed analysis of the value of the assets. The non-binding offer was followed by a binding-offer dated July 18, 2014, of €215 million.

22.    After Novo Banco received the pledge of the shares in Tranquilidade, Novo Banco continued negotiations with Apollo to sell Tranquilidade.

23.    That these discussions were ongoing became a matter of public knowledge. ESFG, ESFP and its creditors notified Novo Banco and ESFG notified Apollo that they believed that the pledge of the shares of Tranquilidade to BES was illegal and invalid and Novo Banco's that proposed sale of  Tranquilidade to Calm Eagle was therefore unlawful as well.  ESFG and ESFP also issued press releases to the same effect, and the concerns also became public knowledge:      https://www.reuters.com/article/portugal-bes-asset-sales/bondholders-challenge-sale-of-espirito-santos-insurance-company-idUSL5N0QX2B820140827.

24.    Despite the notice and warning, in September 2014, Novo Banco and Calm Eagle Holdings S.a.r.l. ("Calm Eagle"), an Apollo subsidiary, entered into a share purchase and sale agreement whereby Novo Bank agreed to sell the shares of Tranquilidade to Calm Eagle for a contractual price of only €25 million, which was an order of magnitude below its fair value at the time of the sale.

25.      On December 17, 2014, two of ESFP's bondholders -- CSCP II Acquisition Luxco SarL and CCP Credit Acquisition Holdings Lexco, both Luxembourg funds controlled by Centerbridge Partners, L.P. ("Centerbridge Funds"), in a proceeding filed with the Lisbon District court, Case No. 1286/14.9TVLSB,  obtained a temporary injunction preventing the sale of Tranquilidade to Calm Eagle on the grounds that the contract establishing the original pledge of the Tranquilidade's shares to BES was null and void.

26.      Other bondholders of ESFP coordinated with the Centerbridge Funds in connection with the application for an injunction, and relied on the injunction in an attempt to save their respective investments.

27.      Then, without notice to the other bondholders (who were relying on the injunction to preserve the status quo) the Centerbridge Funds withdraw their injunction application, thereby allowing the sale of Tranquilidade to Calm Eagle to go forward.

28.      The sale of Tranquilidade to Calm Eagle closed on January 15, 2015, the day after the injunction was lifted, for an undisclosed sum.  ESFP received none of the proceeds of the sale.

29.      It was later discovered that Centerbridge Funds had become equity holders directly or indirectly in Tranquilidade.  This equity grant to Centerbridge has the hallmarks of a *quid pro quo* from Calm Eagle in exchange for Centerbridge's withdrawal of the injunction it had obtained.

The Underlying Law Suit and Need for Discovery

30.      Soon after Tranquilidade was sold to Calm Eagle, ESFG and ESFP (both of which were declared insolvent and placed in liquidation in October 2014) along with Partran (declared insolvent in March 2015) commenced a civil action in the District Court of Lisbon – Central

Instance (Case No. 7624/15.0T8LSB) (the "Portuguese Action") seeking the return of the shares

of Tranquilidade to Partran and to annul the sale of Tranquilidade to Calm Eagle, or alternatively

(since Calm Eagle eventually sold Tranquilidade to a third party buyer after it had been merged

with three minor insurance companies in a deal worth over €510 million) to recover damages

from Novo Banco and Calm Eagle in connection with the 2015 purchase and sale of

Tranquilidade.

31.     The Lisbon District Court is a trial level court of first instance capable of

rendering a decision on the merits leading to a final resolution of the dispute.

32.     Central to the claims in the Portuguese Action is the legality of and motivation of

the purchase of Tranquilidade by Calm Eagle – *i.e*., that Calm Eagle acted with bad faith and

malintent when it purchased Tranquilidade – having had knowledge that the pledge of the

Tranquilidade shares to BES was highly suspect and with knowledge that the sale of

Tranquilidade to Calm Eagle for the agreed contractual price would harm ESFP's bondholders.

33.     Under Portuguese law, the granting of credit by a holding company to its

shareholders is generally prohibited (Decree-Law 495/88, art. 5,1,c)). Furthermore, as

interpreted in art. 4, 1, b) of the Portuguese law on Credit Institutions and Financial Companies

(Decree-Law 298/92), this prohibition of granting credit to a shareholder also includes a

prohibition on guaranteeing a shareholder's debt.

34.     In addition, ESFP never approved the pledge of the shares in Tranquilidade held

by its subsidiary Partran, despite being the holder of 45% of its capital, and had it approved the

pledge, that act, being a disposal of its only asset for free and on behalf of a third party without

adequate consideration, would have been illegal and annullable (art. 121º, 1, b) under  the

Portuguese Insolvency and Corporate Restructure Code).

35.     Another key issue in the Portuguese Action is the amount Calm Eagle paid for Tranquilidade when it purchased the company from Novo Banco in 2015 compared to what Tranquilidade was actually worth at the time of the purchase.  Accordingly, documents that would show valuation of Tranquilidade by Calm Eagle or other parties and any documents that would show the knowledge of or impact of the sale of Tranquilidade upon bondholders and creditors of Partran, ESFG or ESFP, are directly relevant to the ESFP's claims in the Portuguese Action.

36.     An additional key issue in the Portuguese Action is the manner by which and the circumstances surrounding Centerbridge obtaining direct or indirect equity in Tranquilidade, because such facts go directly to the issues of whether the sale of Tranquilidade to Calm Eagle was made in bad faith.

37.      With respect to the discovery sought in this proceeding, the Court in the Portuguese Action would almost certainly be receptive to the discovery requested.

38.     There is also no reason to believe that the production of the discovery requested by ESFP here would violate any public policy.  ESFP merely seeks documents and communications that are in the possession of private parties regarding events that had a dramatic impact on ESFP  and its bondholders and creditors.  Portugal does not have any law of public policy against such discovery.

39.     Under Portuguese law (Article 423(2) of the Portuguese Civil Procedure Code), parties can submit further evidence up to 20 days before the final hearing date.

 I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 under the laws of the United States that the foregoing is true and correct.

Executed on this 21st day of January 2021 in Lisbon, Portugal.

_____

ANTONIO ALFAIA DE CARVALHO