# Exhibit C


Judicial Court of the Judicial District of Lisbon
Central Instance of Lisbon
1st Civil and Commercial Section


Your Honor:


**Partran, S.G.P.S., S.A.,** with headquarters at Rua de São Bernardo, no. 62, 1200-826, Lisbon, legal entity no. 502.272.112, registered at the Commercial Registry of Lisbon under the same number,

**Bankruptcy Estate of Espírito Santo Financial Group, S.A.,** a corporation founded under the laws of Luxembourg, with headquarters at Boulevard Royal, 22-24, L-2449 Luxembourg, in Luxembourg, registered at the Commercial Registry of Luxembourg under no. B 22,232, represented by its Judicial Liquidator, Dr. Laurence Jacques, and

**Bankruptcy Estate of Espírito Santo Financial (Portugal), S.G.P.S., S.A.,** with headquarters at Rua de São Bernardo, no. 62, 1200-826, Lisbon, legal entity no. 502.412.631, registered at the Commercial Registry of Lisbon under the same number, represented by its Bankruptcy Trustee, Dr. Pedro Pidwell, hereby files this

**DECLARATORY ACTION UNDER THE COMMON PROCEDURE**

against **Novo Banco, S.A.,** with headquarters at Av. da Liberdade, no. 195, 1250-142 Lisbon, legal entity no. 513.204.016, registered at the Commercial Registry of Lisbon under the same number, and

**Calm Eagle Holdings, S.À.R.L.,** a corporation founded under the laws of Luxembourg, with headquarters at Rua Guillaume Krool 5, L-1855 Luxembourg, in Luxembourg, registered at the Commercial Registry of Luxembourg under no. B 189,885.


Which they now file based on the following terms and grounds:


9/72                                                                       1


### I.     INTRODUCTION

**1.**

The shareholders of the Plaintiff Partran, S.G.P.S., S.A., (hereinafter called Partran) are the Plaintiff Espírito Santo Financial Group, S.A. (hereinafter ESFG) and the Plaintiff Espírito Santo Financial (Portugal), SGPS, S.A. (hereinafter ESF (Portugal)).

**2.**

The Plaintiff Partran was the sole shareholder of Companhia de Seguros Tranquilidade, S.A. (hereinafter Tranquilidade).

**3.**

And it was part of the so-called (but not technically) Espírito Santo Group.

**4.**

On the eve of the collapse of the Espírito Santo Group, the Plaintiff Partran established a financial pledge (hereinafter called PLEDGE) on the Tranquilidade shares in favor of Banco Espírito Santo, S.A., (hereinafter BES).

**5.**

The PLEDGE was created for the purpose of benefitting BES, to the detriment of the Plaintiffs' creditors.

**6.**

As such, it was an act of fraud against creditors.

**7.**

Therefore, it is null and void.

**8.**

10/72                                                  2


Nothing, from a legal standpoint, or even from a moral or ethical standpoint, justifies the prevalence of the interests of BES – and now of Novo Banco, S.A. (hereinafter Novo Banco) – and of its creditors against the interests of the Plaintiffs' creditors.

**9.**

The Plaintiffs' creditors do not have any relationship with the so-called "Espírito Santo Family."

**10.**

In fact, many of them are individual investors.

**11.**

It is absolutely inadmissible, under the Rule of Law, to favor some creditors to the detriment of others.

**12.**

The current President of the Board of Directors of the Plaintiff Partran did not sign the contract that created the PLEDGE, nor was he even in office on the date on which the contract was executed.

**13.**

Both the Plaintiff ESFG and the Plaintiff ESF (Portugal) were, however, declared to be insolvent.

**14.**

The Plaintiffs are committed to defending the interests of their creditors.

**15.**

It is this obligation to defend the interests of the creditors that has led to the filing of this action.

**16.**

The complaint has the following structure:

I.       INTRODUCTION


II.       THE FACTS

    A.       Execution of the contract that created the pledge

    B.       Loss for creditors

    C.       Intent and bad faith

    D.       Transmission of the pledge

    E.       Enforcement of the pledge and ESAF operation

    F.       Bad faith of the party acquiring the pledged asset

III.      THE LAW

    A.       Nullity of the pledge due to violation of article 19 of the Legal Regime Governing Financial Guarantee Agreements – Fraudulent act against creditors

    B.       Consequence: Accusation of intent and bad faith against the representatives of the legal entities

    C.       Nullity of the pledge due to violation of article 5, no. 1, line c), of the Legal Regime Governing Holding Companies – *Prohibition of granting credit by SGPS*

    D.       Nullity of the pledge due to violation of article 4, no. 1, line b), and article 8, no. 2, of the General Regime of Credit Institutions and Financial Companies – *Banking operations*

    E.       Nullity of the pledge due to violation of article 6, no. 1 and no. 3, of the Commercial Company Code – *Principle of Specialization*

    F.       Nullity of the pledge due to violation of article 397, no. 2, of the Code of Commercial Companies (or annulability for violation of article 261, no. 1, of the Civil Code) – *Inter-entity transaction*

    G.       Ineffectiveness of the pledge pursuant to article 269 of the Civil Code – *Abuse of representation*

    H.       Ineffectiveness of the pledge pursuant to article 409, no. 2, of the Code of Commercial Companies – *Activity outside the company purpose*

    I.       Nullity, annulability and ineffectiveness. Restitution in kind or restitution of value. Indemnification

    J.       ESAF Operation: enforcement of pledge with violation of duties of loyalty and diligence; enrichment without case

    K.       Defective enforcement of pledge

IV.      CLAIM

**II.       THE FACTS**

    **A.       Execution of the contract that created the pledge**

12/72                                                                                                                4



**17.**

The Plaintiff Partran is a holding company, and its company purpose is "the management of shares owned in other companies, as an indirect form of the exercise of economic activities" (see Online Permanent Registry, under access code no. 3786-4157-6814, available at https://www.portaldaempresa.pt/CVE/Services/Online/Pedidos.aspx?service=CCP, a copy of which is attached, as **Doc. No. 1**).

**18.**

The Plaintiff Partran was the owner of shares representing all the capital stock of Tranquilidade (**Doc. No. 2**, on page 12).

**19.**

The Plaintiff ESFG was and is the owner of shares representing 55% of the capital stock of the Plaintiff Partran (**Doc. No. 2,** on page 12).

**20.**

The Plaintiff ESF (Portugal) was and is the owner of shares representing the remaining 45% of the capital stock of the Plaintiff Partran (**Doc. No. 2,** on page 12).

**21.**

The Plaintiff ESFG had and has its statutory and actual headquarters in Luxembourg (**Doc. No. 3**).

**22.**

On July 2, 2014, BES, the Plaintiff ESFG and the Plaintiff Partran executed a written agreement (hereinafter called CONTRACT), called "*Amendment and re-formalization of the Financing and Guarantee Deposit Contract*" (**Doc. No. 4**).

**23.**

Clause 16 of the Contract stipulated a pledge contract, under the terms of which, "*in order to guarantee proper payment of all liabilities arising for ESFG, directly or indirectly, for the failure to fully and timely*

13/72 5


*comply with any obligation arising for it, resulting from Credit… Partran established a first degree financial pledge in favor of BES on the shares*" of Tranquilidade (hereinafter called PLEDGE CLAUSE).

**24.**

The PLEDGE was not created to guarantee a debt owed by the Plaintiff Partran, but instead, to cover a debt owed by the Plaintiff ESFG (as the result of the segment of the CONTRACT now transcribed).

**25.**

In other words, the Plaintiff Partran did not assume its own debt, but instead, provided a collateral guarantee for another party's debts.

**26.**

In turn, the Plaintiff ESFG also did not assume risks that belonged to it, but instead, risks associated with the granting of credit to certain holding companies of the so-called "Espírito Santo Family" – the Luxembourg companies Espírito Santo Internacional, S.A. (hereinafter called ESI) and Rio Forte Investments, S.A. (hereinafter called Rioforte), by non-institutional clients of BES, at the counter of BES itself (as can be seen from the text of the CONTRACT itself).

**27.**

Therefore, the Plaintiff ESFG also did not assume its own debt, but instead, provided a personal guarantee for the debts of others.

**28.**

The CONTRACT was signed, on behalf of BES, by directors Joaquim Goes and Amílcar Morais Pires, on behalf of the Plaintiff ESFG, by directors José Manuel Espírito Santo Silva and Ricardo Espírito Santo Salgado, and on behalf of the Plaintiff Partran, by directors Pedro Beauvillain Brito e Cunha and Ricardo Espírito Santo Salgado (**Doc. No. 4**).

**29.**

It must be emphasized that Ricardo Espírito Santo Salgado signed the CONTRACT as the representative of the Plaintiff ESFG, and as the representative of the Plaintiff Partran.

14/72                                                                 6



**PLMJ**
SOCIEDADE DE ADVOGADOS, RL
A.M.PEREIRA, SÁRAGGA LEAL, OLIVEIRA MARTINS, JÚDICE
E ASSOCIADOS

**30.**

On the date the CONTRACT was signed, Ricardo Espírito Santo Salgado and Pedro Beauvillain Brito e Cunha were directors of the Plaintiff Partran (**Doc. No. 1**).

**31.**

On the date the CONTRACT was signed, Pedro Beauvillain Brito e Cunha was the director of the Plaintiff ESFG, alongside the aforementioned José Manuel Espírito Santo Silva and Ricardo Espírito Santo Salgado (**Doc. No. 3**).

**32.**

On the date the CONTRACT was signed, Ricardo Espírito Santo Salgado and José Manuel Espírito Santo Silva were directors of BES, alongside the aforementioned Joaquim Goes and Amílcar Morais Pires (according to the Online Permanent Registry, under access code no. 3327-7858-6807, a copy of which is attached, as **Doc. No. 5**).

**33.**

Ricardo Espírito Santo Salgado and Pedro Beauvillain Brito e Cunha did not obtain prior authorization from the Board of Directors of the Plaintiff Partran, which did not deliberate on this matter, for the establishment of the PLEDGE.

**34.**

Ricardo Espírito Santo Salgado and Pedro Beauvillain Brito e Cunha did not obtain a prior favorable opinion of the Audit Committee of the Plaintiff Partran, for the establishment of the PLEDGE.

**35.**

The shareholders of the Plaintiff Partran did not vote to authorize the establishment of the PLEDGE, and the Plaintiff ESF (Portugal) was not even consulted on this matter.

**B.      Loss for creditors**

**36.**

15/72                                                                                          7



The Tranquilidade shares are, as they already were on the date the PLEDGE was established, the only relevant asset of the Plaintiff Partran (**Doc. No. 2**, on page 12).

**37.**

The Plaintiff Partran owed the following debts to suppliers: EUR 11,562.00 (eleven thousand, five hundred and sixty-two Euros), to "Espírito Santo Resources Portugal, S.A"; it owed EUR 9,840.00 (nine thousand, eight hundred and forty Euros), to "KPMG & Associados, Sociedade de Revisores Oficiais de Contas, S.A." and EUR 20,295.00 (twenty thousand, two hundred and ninety-five Euros), to "Amável Calhau, Ribeiro da Cunha e Associados, Sociedade de Revisores Oficiais de Contas, S.A." (**Docs. No. 6, 7 and 8**).

**38.**

Since January 7, 2005, the Plaintiff Partran owed a debt to the Plaintiff ESFG, its shareholder, for supplies, and since March 15, 2011, this debt totaled EUR 133,810,367.00 (one hundred thirty-three million, eight hundred and ten thousand, three hundred and sixty-seven Euros) (**Doc. No. 9**).

**39.**

On October 10, 2014, the Commercial Court of Luxembourg declared the Plaintiff ESFG to be insolvent (**Doc. No. 10**).

**40.**

In the insolvency proceeding of the Plaintiff ESFG, credits are in question in the total amount of some 1,343,950,000.00 (one billion, three hundred and forty-three million, nine hundred and fifty thousand Euros); this amount is not owed only to institutional investors, but also to individual investors (**Doc. No. 11**).

**41.**

On October 27, 2014, the 1st Commercial Section Court of the Central Instance of the Judicial District of Lisbon declared the Plaintiff ESF (Portugal) to be insolvent (**Doc. No. 12**).

**42.**

16/72


In the insolvency proceeding of the Plaintiff ESF (Portugal), according to the provisional list of credits attached to the report, referred to in article 155 of the Corporate Bankruptcy and Reorganization Code, the credits in question total 337,229,294.01 (three hundred and thirty-seven million, two hundred and twenty-nine thousand, two hundred and ninety-four Euros and one cent) (**Doc. No. 13**).

#### 43.

The PLEDGE is harming the creditors of the Plaintiff Partran, its suppliers, drastically reducing the possibility that its debts will be paid.

#### 44.

The PLEDGE is also clearly and drastically harming the Plaintiff ESFG, not only in its capacity as shareholder, but above all, as creditor of the Plaintiff Partran, making it impossible for the company to obtain payment of its credits owed by the Plaintiff Partran.

#### 45.

This, in turn, given the situation of insolvency of the Plaintiff ESFG, is harming its creditors, and some of these creditors are individual investors.

#### 46.

Finally, the PLEDGE is harming the Plaintiff ESF (Portugal), in its capacity as shareholder of the Plaintiff Partran, and indirectly, given its insolvency, it is harming its creditors.

    **C.**       **Intent and bad faith**

#### 47.

On July 1, 2014, a meeting of the Board of Directors of the Plaintiff ESFG, during which several directors voiced their opposition to the establishment of pledges in favor of BES and affirmed that these pledges were illegal and harmful to the creditors (**Doc. No. 14**).

#### 48.

17/72

9


At this meeting, it was emphasized that the Plaintiff ESFG was in a weak financial situation, with a high likelihood of generalized breach of its obligations (**Doc. No. 14**).

**49.**

It was also noted that the establishment of pledges would constitute fraudulent use of the company's property, benefitting BES to the detriment of the other creditors (**Doc. No. 14**).

**50.**

Present at this meeting were Ricardo Espírito Santo Salgado, José Manuel Espírito Santo Silva, Joaquim Goes and Pedro Beauvillain Brito e Cunha (**Doc. No. 14**).

**51.**

At the end of the meeting, the establishment of pledges was not deliberated on,

**52.**

Instead, the only matter discussed was the continuation of negotiations with Banco de Portugal for the establishment of pledges (**Doc. No. 14**).

**53.**

In light of the need to not treat the other shareholders and creditors differently (**Doc. No. 14**).

**54.**

And even this resolution was only approved by a majority vote, since three directors of the Plaintiff ESFG voted against it (**Doc. No. 14**).

**55.**

In spite of the content of the resolution, and above all, in spite of the warnings described, Ricardo Espírito Santo Salgado, José Manuel Espírito Santo Silva, Pedro Beauvillain Brito e Cunha and Joaquim Goes signed the CONTRACT (**Doc. No. 4**).

**56.**



Ricardo Espírito Santo Salgado, José Manuel Espírito Santo Silva, Pedro Beauvillain Brito e Cunha, Joaquim Goes and Amílcar Morais Pires signed the CONTRACT, which contains the PLEDGE CLAUSE, with the intention of favoring BES and certain holding companies of the so-called "Espírito Santo Family"-- ESI and Rioforte -- to the detriment of the creditors of the Plaintiff Partran and of the creditors of Plaintiff ESFG and Plaintiff ESF (Portugal).

**57.**

Ricardo Espírito Santo Salgado, José Manuel Espírito Santo Silva, Pedro Beauvillain Brito e Cunha, Joaquim Goes and Amílcar Morais Pires signed the CONTRACT, which contains the PLEDGE CLAUSE, with awareness of the loss that it caused to the creditors of Plaintiff Partran and to the creditors of Plaintiff ESFG and Plaintiff ESF (Portugal).

**58.**

It should be added that during the weeks prior to the establishment of the Pledge, several internal and external collaborators of the Plaintiff ESFG brought to the attention of its directors, who were also simultaneously the directors of BES and of the Plaintiff Partran, the financial problems faced by the Plaintiff ESFG and the illegality of establishing pledges and guarantees for the debts of others, to the detriment of the creditors.

We will now examine this in greater depth:

**59.**

On April 10, 2014, Filipe Worsdell, Financial Director of the Plaintiff ESFG, sent an email to Ricardo Espírito Santo Salgado, referring, among other matters, to the fact that using Tranquilidade to pay the debts of other parties, without receiving any payment in exchange, would be harmful to creditors (**Doc. No. 15**).

**60.**

On April 25, 2014, Dr. Hoss, the Luxembourg attorney representing ESI, warned of serious irregularities in the ESI financial statements (**Doc. No. 16**).

**61.**

19/72 11


This raised questions as to whether the provision of guarantees for payment of ESI debts was or was not legal (**Doc. No. 16**).

### 62.

As a result, the law firm Linklaters, through its Luxembourg department, had to modify the content of a legal opinion that was favorable to the establishment of these guarantees. (**Doc. No. 16**).

### 63.

On June 4, 2014, Roger Hartmann, Executive Manager of the Plaintiff ESFG, sent a letter to Ricardo Espírito Santo Salgado in which he affirmed, among other things, that the establishment of new pledges would create the risk of a reaction from creditors, who would object to their creation (**Doc. No. 17**).

### 64.

On June 4, 2014, Filipe Worsdell, Financial Director of the Plaintiff ESFG, sent a letter to Ricardo Espírito Santo Salgado, calling his attention to the strong financial difficulties faced by the Plaintiff ESFG and its subsidiaries, whether in regard to its capacity to repay debts that were coming due soon, or in regard to its ability to obtain financing (**Doc. No. 18**).

### 65.

On June 23, 2014, Tom Loesch, Luxembourg attorney hired by the Independent Directors of the Plaintiff ESFG, who were part of its Fiscal Board, issued a legal opinion, warning of the risk of criminal liability, with express reference to the establishment of unjustified pledges and guarantees, favoring creditors (or majority shareholders), to the detriment of the other creditors (or the minority shareholders) (**Doc. No. 19**).

### 66.

On June 26, 2014, Filipe Worsdell, Financial Director of the Plaintiff ESFG, sent a letter to Ricardo Espírito Santo Salgado, resigning from his position. (**Doc. No. 20**).

20/72 <span style="float:right">12</span>


**67.**

In this letter, Filipe Worsdell noted the dramatic increase in the consolidated debt of the Plaintiff ESFG (**Doc. No. 20**).

**68.**

And he noted that the establishment of pledges in favor of a single creditor harmed the other creditors (**Doc. No. 20**).

**69.**

On June 27, 2014, the law firm Linklaters, through its Luxembourg department, changed the wording of the legal opinion in favor of the establishment of guarantees, and this time, it noted the risk of misuse of corporate assets (**Doc. No. 21**).

**70.**

It should be added that during the course of 2014, the financial situation of the Plaintiff ESFG became ever weaker, with a significant increase in its consolidated debt,

**71.**

And, at the end of June 2014, the Plaintiff ESFG was already in a situation of breach of its consolidated debt, and unable to re-establish its financial situation (**Doc. No. 22,** especially page 6).

**72.**

For this reason, it was very likely that in the future, the guaranteed debt would not be paid.

**73.**

It was also very likely that the PLEDGE would be enforced.

**74.**

And in fact, this did occur.


**75.**

It should also be noted that simultaneous to the establishment of the PLEDGE, there was a broadening of the guarantee of the Plaintiff ESFG, which began to be liable not only for the debts of ESI to the clients of BES, but also for the debts owed by Rioforte to the clients of BES (**Doc. No. 4**).

**76.**

In other words, in the midst of the financial and liquidity crisis of the Plaintiff ESFG, the guarantee extended to the BES clients was broadened.

**77.**

This greatly increased the likelihood of breach of the debt guaranteed, and as a result, the likelihood of enforcement of the PLEDGE.

**78.**

What is more, some of the executive directors even prepared minutes of the Board of Directors meeting of the Plaintiff ESFG, dated June 24, 2014, supposedly approving the establishment of the PLEDGE, and sending it to Banco de Portugal (**Docs. No. 23, 24, 25, 26, 27, 28 and 29**).

**79.**

Among these Directors was Ricardo Espírito Santo, himself a director of BES.

**80.**

However, at the Board of Directors meeting of the Plaintiff ESFG that was actually held on June 24, 2014, no resolution was passed on the establishment of the PLEDGE (as can clearly be seen in the original minutes, which are attached as **Doc. No. 30**).

**81.**

Moreover, at the Board of Directors meeting of the Plaintiff ESFG that was held on July 10, 2014, one of the directors asked Ricardo Espírito Santo Salgado whether the pledges, which included the PLEDGE in


question, had already been established, and the latter responded that they were in the process of being established (**Docs no. 31 and 32**).

### 82.

This indicates that the CONTRACT, through which the PLEDGE was established, was executed after July 10, 2014, and that the date placed on it is incorrect.

### 83.

All these facts show that the intent to favor BES and certain holding companies of the so-called "Espírito Santo Family" -- ESI and Rioforte -- to the determinant of the Plaintiffs' creditors, was particularly intense.

### 84.

Symptomatically, in light of the internal pressures and the risks of liability, at a meeting held on July 14, 2014, the directors of the Plaintiff ESFG unanimously passed a resolution to "immediately cancel all the pledges in favor of BES and to contest any act that they may nonetheless have approved" (**Doc. No. 33**).

### 85.

Ricardo Espírito Santo Salgado, José Manuel Espírito Santo Silva, Joaquim Goes and Amílcar Morais Pires knew that the PLEDGE was harmful to the Plaintiff Partran, since it burdened their only asset, without any compensation.

### 86.

If Ricardo Espírito Santo Salgado, José Manuel Espírito Santo Silva, Joaquim Goes and Amílcar Morais Pires had analyzed the operation with a minimal degree of diligence, they could not have failed to see that the PLEDGE was harmful to the Plaintiff Partran, since it encumbered its property, without any compensation

### 87.

23/72 15


Ricardo Espírito Santo Salgado, José Manuel Espírito Santo Silva, Joaquim Goes and Amílcar Morais Pires knew that the PLEDGE did not fall under the company purpose of the Plaintiff Partran, since it consisted of the provision of a guarantee to a company in which they did not have any ownership.

**88.**

If Ricardo Espírito Santo Salgado, José Manuel Espírito Santo Silva, Joaquim Goes and Amílcar Morais Pires had analyzed the operation with a minimal degree of diligence, they could not have failed to see that the rendering of guarantees to companies in which they did not own shares was not an activity of a holding company, and therefore, the PLEDGE did not meet the company purpose of the Plaintiff Partran.

### D.       Transmission of the pledge

**89.**

Banco de Portugal, in an extraordinary meeting of its Board of Directors, held on August 3, 2014, adopted a resolution (hereinafter called RESOLUTION), establishing the Defendant Novo Banco and the transfer to this bank of "all the assets, license and rights, including BES property rights" (**Doc. No. 34**).

**90.**

Which means that the PLEDGE, as an asset of BES, was transferred to the Defendant Novo Banco.

### E.       Enforcement of the pledge and ESAF operation

**91.**

However, since the beginning of 2014, negotiations were being held with the Apollo Group, directly and through its subsidiary, the Defendant Calm Eagle Holdings, S.à.r.l. (hereinafter called Calm Eagle), in regard to the sale of the Tranquilidade shares.

**92.**

On May 23, the Apollo Group offered a non-binding offer of 228 million Euros for the Tranquilidade

24/72                                                                    16



shares, subject to corrections resulting from a detailed analysis of the value of the Tranquilidade shares (due diligence).

**93.**

On May 30, 2014, while negotiations were fully underway for the sale of Tranquilidade, BES sold shares to Tranquilidade that represented 10% of the capital stock of ESAF – Espírito Santo Activos Financeiros, S.G.P.S., S.A. (hereinafter called ESAF), for 29.7 million Euros.

**94.**

It was immediately agreed that this sale would be temporary, and that BES would repurchase the ESAF shares from Tranquilidade (**Doc. No. 35,** on page 3).

**95.**

This repurchase was to be done at the same price.

**96.**

What is not openly evident is that the purpose of this operation was to finance and attribute liquidity to BES, causing it to receive 29.7 million Euros.

**97.**

This was to the detriment of Tranquilidade, which at this point was already facing a liquidity crisis and in the midst of a sale process.

**98.**

BES had to know that the only purpose for this operation was to hide financing of the liquidity of BES.

**99.**

After the establishment of the PLEDGE and the RESOLUTION, the Defendant Novo Banco began to assume the negotiations with Apollo and the Defendant Calm Eagle, its subsidiary, for the sale of the Tranquilidade shares, and to thus enforce the PLEDGE.

25/72


**100.**

As a result of the RESOLUTION, both its majority ownership of the capital stock of ESAF, and the agreement with Tranquilidade to repurchase shares that represent 10% of the capital stock of ESAF, were transferred from BES to the Defendant Novo Banco.

**101.**

Due diligence on the Tranquilidade shares would have revealed that the ESAF shares were only worth 16 million Euros.

**102.**

Therefore, the sale of the ESAF shares not only provided liquidity to BES, but also enriched BES by at least 13.7 million Euros.

**103.**

This, in turn, benefitted BES, and after the Resolution, it also benefitted the Defendant Novo Banco by the same amount.

**104.**

And it caused not only a loss of liquidity for Tranquilidade, and indirectly, for the Plaintiffs, but also led to a loss of at least 13.7 million Euros.

**105.**

At that time, Tranquilidade was already in violation of the minimum legal number of the so-called technical or mathematical provisions that serve to cover insured risks.

**106.**

In other words, this was at a time when Tranquilidade already needed re-capitalization, to be able to continue its company purpose as an insurer.

**107.**

All of these losses generated through the ESAF operation had a negative reflection on the price to be obtained for Tranquilidade.

26/72

18


**108.**

After the situation of ownership of ESAF capital stock was discovered, in the first round of negotiations between the Defendant Novo Banco and the Defendant Calm Eagle, the price to be paid for the purchase of Tranquilidade was reduced by 13 million Euros.

**109.**

In the second round of negotiations, the Defendant Novo Banco and the Defendant Calm Eagle agreed that the initial purchase price of Tranquilidade would be reduced by 29 million Euros, and Defendant Novo Banco would have the right to purchase the ESAF shares, if it so chose.

**110.**

It was also agreed that in the event the Defendant Novo Banco opted to purchase the ESAF shares, the funds from the sale of these shares to the Defendant Novo Banco would go, in a first financial flow, to the Defendant Calm Eagle, through Tranquilidade, at the sale prices, and that they would return, in a second financial flow, to the Defendant Novo Banco, as compensation for the enforcement of the PLEDGE.

**111.**

Tranquilidade was the owner of shares representing 55% of the capital stock of ES Contact Center – Gestão de Call Centers, S.A. (hereinafter Contact), with an accounting value of 6 million Euros.

**112.**

In regard to the Contact, the Defendant Novo Banco agreed with the Defendant Calm Eagle that the initial purchase price of Tranquilidade would be reduced by 6 million Euros, and the Defendant Calm Eagle promised to later auction the shares of the Contact and deliver them to the Defendant Novo Banco, as compensation for enforcement of the Pledge.

**113.**

On September 12, 2014, the Defendant Novo Banco agreed with the Defendant Calm Eagle to sign a written agreement (hereinafter called the PLEDGE ENFORCEMENT CONTRACT), called the "*Share Purchase and Sale*

27/72                                                                                              19


*Agreement*," which stated in clause 2 that depending on certain conditions, the Defendant Novo Banco, in its capacity as unsecured creditor, will sell shares of Tranquilidade to Calm Eagle, and the latter would buy them.

**114.**

Clause 3.1 stipulated that on the closing date, the Defendant Calm Eagle will pay the Defendant Novo Banco the amount of 25 million Euros in cash.

**115.**

Clause 3.2 stipulated that the parties will cooperate among themselves to sell the Contact shares at auction and that right after these shares are sold, the Defendant Calm Eagle would pay the Defendant Novo Banco the amount equivalent to the sale price of the shares.

**116.**

Clause 3.3 stated that the Defendant Novo Banco could require that the Defendant Calm Eagle sell the ESAF shares to the Defendant Novo Banco or to a person it indicates in exchange for payment of the amount of an assessment, and that right after the sale of these shares, the Defendant Calm Eagle would pay the Defendant Novo Banco the amount equivalent to the sale price of the shares.

**117.**

Clause 3.4 stipulated that in the event the sale of the Contact shares and the sale of the ESAF shares are not concluded by certain dates, then, for the purpose of the PLEDGE ENFORCEMENT CONTRACT, their price would be equivalent to zero.

**118.**

Clause 4.1.1 stated that the contract was executed under the condition precedent that the Insurance Institute of Portugal not be opposed to it.

**119.**

Ownership of the Tranquilidade shares is registered in favor of the Plaintiff Partran under share registry account no. 0006.9680.0180, together with the Defendant Novo Banco (**Doc. No. 36**).



**120.**

On January 15, 2015, without having received instructions to do so from the Plaintiff Partran, the Defendant Novo Banco made a transaction in this account, transferring ownership of the Tranquilidade shares to the Defendant Calm Eagle (**Doc. No. 36**).

**121.**

On January 15, 2015, the Defendant Novo Banco received from the Defendant Calm Eagle the amount of 25 million Euros, in enforcement of the PLEDGE.

**122.**

The process to sell the Tranquilidade shares was not open to all possible bidders.

**123.**

By conducting a closed sale process, demand was limited; this tends to cause a reduction in the price offered.

**124.**

After leading the negotiations, enforcing the PLEDGE, the Defendant Novo Banco did not open the process to sell the Tranquilidade shares to all possible bidders.

**125.**

After leading the negotiations with the Defendant Calm Eagle, the Defendant Novo Banco accepted several reductions to the price initially proposed.

**126.**

The Defendant Novo Banco enforced the PLEDGE without a prior assessment of Tranquilidade.

**127.**

The Defendant Novo Banco enforced the PLEDGE without guaranteeing that the total value of Tranquilidade, with all its assets, was immediately received,

29/72

21


**128.**

Having accepted a delay in payment of the installments of the price relative to the ESAF and Contact assets.

**129.**

On January 15, 2015, Tranquilidade had a value greater than the price actually paid by the Defendant Calm Eagle.

**F.       Bad faith of the party acquiring the pledged asset**

**130.**

In a letter dated August 22, 2014, the Plaintiff ESFG notified Apollo, of which the Defendant Calm Eagle is a subsidiary, that it considered the PLEDGE to be null and void (**Doc. No. 37**).

**131.**

In different notifications through the Securities and Exchange Market Commission information system, on August 29, 2014, and September 18, 2014, the Plaintiff ESFG indicated that it considered the PLEDGE to be illegal (**Docs. No. 38 and 39**).

**132.**

The Court of Appeals of Lisbon, in a decision issued on December 17, 2014, within the scope of case no. 1286/14.9TVLSB, judged the contract that established the PLEDGE to be null and void (**Doc. No. 40**).

**133.**

The Defendant Calm Eagle had knowledge of the full content of this decision at a point prior to January 15, 2015.

**III.      THE LAW**

**A.       Nullity of the pledge due to violation of article 19 of the Legal Regime**

WATER STREET TRANSLATIONS


**Governing Financial Guarantee Agreements – Fraudulent act against creditors**

**134.**

The PLEDGE should be treated as a financial pledge, for the purpose of articles 2, no. 2 of Decree-Law no. 105/2004, of May 8 (Legal Regime of Financial Guarantee Agreements, hereinafter called RJAGF).

**135.**

More on financial pledges can be found in RUI PINTO DUARTE, *Curso de direitos reais,* 3rd edition, Estoril, Principia, 2013, pages 266-271, ANTÓNIO MENEZES CORDEIRO, *Direito bancário,* 5th edition, Coimbra, Almedina, 2014, pages 815-819 and 823-825, JOÃO CALVÃO DA SILVA, *Banca, bolsa e seguros – Direito europeu e português*, I, 2nd edition, Coimbra, Almedina, 2007, pages 205-236, LUIS PESTANA DE VASCONCELOS, *Direito das garantias*, 2nd edition, Coimbra, Almedina, 2015, pages 291-320, and MARGARIDA COSTA ANDRADE, *"O penhor financeiro com direito de disposição de valores mobiliários,"* Revista da Ordem dos Advogados, year 70, 2010, vol. I/IV.

**136.**

The contract that established the PLEDGE was executed intentionally to the detriment of other creditors, pursuant to the terms of article 19 of the RJAGF.

**137.**

It should be noted that the best legal doctrine, when interpreting this article 19 of the RJAGF, calls up the civil law notion of bad faith (in this regard, see ANTÓNIO MENEZES CORDIRO, *Direito bancário,* 5th edition, Coimbra, Almedina, 2014, page 824).

**138.**

Bad faith corresponds to the awareness of the harm that the act causes to the creditor.

**139.**

In accordance with this legal doctrine, for the purpose of application of article 19 of the RJAGF, it is sufficient to have evidence that the contract that established the PLEDGE was executed with awareness of the loss that it would cause to the creditors of the Plaintiffs.


**140.**

However, in this case, it is very evident that not only was there an awareness of the loss caused to the Plaintiffs' creditors (bad faith), but that there was also a clear intention to favor BES and other holding companies of the so called "Espírito Santo Family" – ESI and Rioforte – to the detriment of the Plaintiffs' creditors (intent).

**141.**

In addition, the facts indicated allow us to conclude that this intent was particularly intense, insofar as the signers of the CONTRACT:

- ignored several warnings, including an independent legal opinion,
- knew that the Plaintiff ESFG was already behind on payment of its consolidated debt,
- and acted in violation with what was decided by the Board of Directors of the Plaintiff ESFG,
- even reaching the point of drawing up minutes of the Board of Directors of the Plaintiff ESFG that were in violation of what was decided
- with evidence of placement of an incorrect date on the CONTRACT

**142.**

The contract that established the PLEDGE is null and void, based on the provision in article 19 of the RJAGF and on articles 281 and 294 of the Civil Code.

**143.**

The Court of Appeals of Lisbon, within the scope of case no. 1286/14.9TVLSB, has already had the opportunity to evaluate the validity of the contract that established the PLEDGE, and clearly stated on page 20 of its Decision that it was an act that favored certain creditors to the detriment of others, in violation of the fundamental principle of *par conditio creditorum* (**Doc. No. 40**).

     **B.**     **Consequence: Accusation of intent and bad faith against the representatives of the legal entities**

32/72


**144.**

As was clearly alleged, the CONTRACT signers acted with intent (intention to favor one creditor to the detriment of the other creditors) and bad faith (awareness of the harm to the other creditors).

**145.**

As a mere precaution, in the event that it is not proven that *all* the representatives acted with intent and bad faith, we will now argue that it is sufficient for there to be intent or bad faith on the part of just *one* of the representatives.

We will now examine the matter:

**146.**

We are dealing with the legal problem of imputation of subjective states of the representatives of legal entities.

**147.**

Legal entities are human creations without bodies or minds, which do not have subjective states, such as intent (intention to favor or cause harm) or bad faith (awareness of the harm), and therefore, it is necessary to verify under which circumstances or subjective states their representatives can be held liable.

**148.**

The matter of imputation of subjective states of representatives is covered in article 259, no. 1, of the Civil Code, from where the rule comes that "…. *Knowledge or ignorance of the facts that can influence the effects of the business transaction must be verified in the person of the representative*."

**149.**

What does the law say, if the represented party, as almost always occurs with legal entities, has more than one representative? Is it sufficient for there to be intent or bad faith of a single representative?

**150.**

33/72

25


The national legal doctrine has given scant attention to this problem, and a look at German doctrine offers clearer conclusions:

**151.**

It is sufficient that there be intent or bad faith on the part of one of the representatives that acted in the execution of the legal transaction (see HANS-JOACHIM MERTENS and ANDREAS CAHN, Kölner Kommentar zum Aktiengesetz, 3rd edition, Cologne, Heymanns, 2010, § 76, Rn. 86 and WOLFGANG HEFERMEHL and GERALD SPINDLER, Münchener Kommentar zum Aktiengesetz, 2nd edition, Munich, Beck/Vahlen, 2004, § 78, Rn. 79).

**152.**

The principal argument is derived from the principle of equality, as follows:

**153.**

Legal entities cannot be treated in a privileged manner in comparison with human beings, benefitting a lax regime of imputation of intent, of bad faith, or of other subjective states (indicating this argument is MATHIAS HABERSACK, Grosskommentar zum Aktiengesetz, 4th edition, Berlim, Gruyter, 2003, § 78, Rn. 25).

**154.**

Now, the rule that intent or bad faith on the part of a single administrator is sufficient is the one that best conforms to the wording of article 259, no. 1, of the Civil Code.

**155.**

This is also the only interpretation that is in line with the principle of equality, established in article 13 of the Constitution of the Republic of Portugal, and for this reason, we hereby invoke, for all purposes, the unconstitutionality of any different normative interpretation.

**156.**

Returning to the case in question, we repeat that it is sufficient to determine the intent or bad faith of just one of the directors, and we emphasize that intent and bad faith are particularly evident and intense in the then President of the Executive Commission of BES and of the Boards of Directors of the Plaintiff ESFG and the Plaintiff Partran.


**C.** **Nullity of the pledge due to violation of article 5, no. 1, line c), of the Legal Regime Governing Holding Companies – Prohibition of granting credit by SGPS**

**157.**

The PLEDGE violates article 5, no. 1, line c), of Decree-Law no. 495/88, of December 30, (Legal Regime Governing Holding Companies, hereinafter called the RJSGPS).

**158.**

This article prohibits the concession of credit by holding companies, specifically to their shareholders.

**159.**

This prohibition against the concession of credit should be interpreted in the sense of covering the granting of guarantees, in accordance with the definition of concession of credit adopted in article 4, no. 1, line b), of Decree-Law no. 298/92, of December 31 (General Regime of Credit Institutions and Financial Companies).

**160.**

This establishes the rule of systematic interpretation of the law.

**161.**

Equally at stake is the need for teleological interpretation of the law, since what is being sought is to prohibit Holding Companies from helping their shareholders, whether directly, through the granting of loans, or indirectly, through the provision of guarantees to financier third parties.

**162.**

See CARLOS OSÓRIO DE CASTRO and DIOGO LORENA DE BRITO, "A concessão de crédito por uma SGPS às sociedades estrangeiras por ela dominadas (ou às sociedades nacionais indiretamente dominadas através de uma sociedade estrangeira) and article 481, no. 2 of the C.S.C.," *O Direito,* year


136, 2004, I, page 136, and JOÃO MARCELO FERREIRA CRISTÓVÃO, Garantias Prestadas por Sociedades Comerciais a Obrigações de Sociedades Coligadas, page 85, Master's Degree thesis available at http://run.unl.pt/bitstream/10362/6832/1/Cristovao_2011.PDF.

**163.**

Therefore, the contract that established the PLEDGE is null and void, pursuant to the provision in article 5, no. 1, line c), of the RJSGPS and article 294 of the Civil Code.

**164.**

This same conclusion was adopted by the Court of Appeals of Lisbon, within the scope of case no. 1286/14.9TVLSB, when it evaluated the validity of the contract that established the PLEDGE (**Doc. No. 40**).

D.    **Nullity of the pledge due to violation of article 4, no. 1, line b), and article 8, no. 2, of the General Regime of Credit Institutions and Financial Companies –** *Banking operations*

**165.**

The PLEDGE violates article 4, no. 1, line b), and article 8, no. 2, of Decree-Law no. 298/92, of December 31 (General Regime of Credit Institutions and Financial Companies).

**166.**

These articles attribute the capacity to conduct credit operations, which includes the concession of guarantees, exclusively to the banks.

**167.**

In regard to this matter, see legal scholars ALEXANDRE DE SOVERAL MARTINS, in JORGE COUTINHO DE ABREU (Coordination), *Código das Sociedades Comerciais em Comentário*, vol. I, Coimbra, Almedina, 2010, page 115, note 21, and CARLOS OSÓRIO DE CASTRO and DIOGO LORENA DE BRITO, "A concessão de crédito por uma SGPS às sociedades estrangeiras por ela dominadas (ou às sociedades nacionais indirectamente

36/72                                                                                      28

dominadas através de uma sociedade estrangeira) and article 481, no. 2, of the C.S.C.," *O Direito,* year 136, 2004, I, page 136, note 22.

### 168.

Note that the PLEDGE, besides being itself a guarantee, was not a form of an indirect granting of financing (provision of a guarantee for the purpose of granting financing); for this reason, it doubly violates the prohibition established by the RGICSF.

### 169.

Therefore, the contract that established the PLEDGE is null and void, pursuant to the provision in articles 4, no. 1, line b), and article 8, no. 2 of the RGICSF, and article 294 of the Civil Code.

### 170.

This same conclusion was adopted by the Court of Appeals of Lisbon, within the scope of case no. 1286/14.9TVLSB (**Doc. No. 40**).

E. **Nullity of the pledge due to violation of article 6, no. 1 and no. 3, of the Commercial Company Code – Principle of Specialization**

### 171.

The contract that established the PLEDGE represents the provision by the Plaintiff Partran of a real guarantee in favor of third parties, in accordance with the provision in article 6, no. 1 and no. 3, of the Commercial Company Code – the so-called *principle of specialization.*

### 172.

The final part of no. 3 of article 6 – "*except …. in the case of a company in a relationship of control or of a group*" -- this establishes the exceptions for situations of granting guarantees to companies in a relationship of control or of a group.

### 173.

37/72

29


However, the scope of application of this rule is laid out in article 481, no. 2, of the Commercial Company Code, which restricts it to groups formed by companies that are headquartered in Portugal.

**174.**

In regard to this matter, see legal scholars CATARINA TAVARES LOUREIRO and JOANA TORRES EREIO *"A relação de domínio ou de grupo como pressuposto de facto para a aplicação das normas do Código das Sociedades Comerciais – o âmbito esapcial em particular,"* Actualidad Jurídica Uria Menéndes, no. 30, 2011, p 57, at http://www.uria.com/documentos/publicaciones/3223/document/art05.0df?id=3371.

**175.**

They add, as a subsidiary argument, that the final part of no. 3 of article 6 only allows the provision of guarantees by the controlling company in favor of the controlled company, and does not allow the provision of guarantees by the controlled company in favor of the controlling company.

**176.**

In regard to this matter, see legal scholars JORGE COUTINHO DE ABREU, Curso de direito commercial, vol. II, 4th edition, Coimbra, Almedina, 2011, pages 202-207, ALEXANDRE DE SOVERAL MARTINS, in JORGE COUTINHO DE ABREU (Coordination), *Código das Sociedades Comerciais em Comentário*, vol. I, Coimbra, Almedina, 2010, pages 117-118, and CARLOS OSÓRIO DE CASTRO "*De novo sobre a prestação de garantias por sociedades a dívidas de outras entidades: luzes e sombras,"* Revista da Ordem de Advogados, 1998, pages 854-855.

**177.**

Therefore, the Plaintiff Partran could not provide a guarantee in favor of the Plaintiff ESFG.

**178.**

No. 3 of article 6 of the Commercial Company Code also establishes exceptions for situations in which there is a *"justified own interest of the guarantor company."*

**179.**


Now, in the case in question, we are dealing with a guarantee granted without cost, without any compensation for the Plaintiff Partran, which allows us to conclude that there is no justified own interest.

**180.**

In addition, on the date on which the PLEDGE was established, the Plaintiff Partran was already in a situation of breach of its obligations, in which the enforcement of the PLEDGE was very likely, and in which such enforcement would lead the Plaintiff Partran itself to a situation of insolvency.

**181.**

Therefore, it is absolutely unconceivable that there could be a justified own interest on the part of the Plaintiff Partran in granting the PLEDGE.

**182.**

This is a situation of a clear absence of a justified own interest of the guarantor company, equivalent to those analyzed in the Decision by the Court of Appeals of Lisbon dated June 29, 2010, case no. 3257/06.0TBOER-A.L1-1, in the Decision by the Court of Appeals of Lisbon dated June 30, 2011, case no. 14818/07.0YYLSB-A.L1-7, both available at www.dgsi.pt, and in the recent Decision by the Court of Appeals of Coimbra of February 10, 2015, case no. 1453/13.2TBFIG-B.C1 (a copy of which is attached as **Doc. No. 41**).

**183.**

Therefore, the contract that established the PLEDGE is null and void, based on the provision in article 6, no. 1 and no. 3, of the Commercial Company Code and on article 294 of the Civil Code.

**184.**

Thus, we once again emphasize that the Court of Appeals of Lisbon, within the scope of case no. 1286/14.9TVLSB also reached this conclusion, and noted that Partran, now a Plaintiff, had no justified own interest in the establishment of the PLEDGE (**Doc. No. 40**).

F. **Nullity of the pledge due to violation of article 397, no. 2, of the Code of Commercial Companies (or annulability for violation of article 261, no. 1, of the Civil Code) –** *Inter-entity transaction*

39/72                                                                                                            31


**185.**

The contract that established the PLEDGE was signed by Ricardo Espírito Santo Salgado while he was simultaneously the representative of the Plaintiff ESFG and a representative of the Plaintiff Partran.

**186.**

Therefore, we are dealing with a case of an inter-entity transaction, in the modality of dual representation.

**187.**

In cases of dual representation, the same person acts as the representative of both parties in the legal transaction.

**188.**

In dual representation, as in other modalities of inter-entity transactions, there is such a high risk of disregarding the interests of the represented party that lawmakers chose to affect the effectiveness of the legal transactions without requiring proof of actual loss for the represented party (as was explained long ago by INOCÊNCIO GALVÃO TELLES, "Contrato entre a sociedade anônima e o seu director," O Direito, 1955, pages 14-17, and ADRIANO VAZ SERRA, "Contrato consigo mesmo," RLJ, year 91, 1958, page 180, in line with German legal doctrine, with this adherence to such doctrine unanimous among Portuguese legal scholars.

**189.**

Dual representation is not established in the wording of article 397, no. 2, of the Code of Commercial Companies.

**190.**

However, article 397, no. 2, of the Code of Commercial Companies should be applied based on analogy to situations of dual representation.

**191.**

This was noted by JOSÉ FERREIRA GOMES in "Conflito de interesses no direito financeiro e societário:


um balanço a partir da crise financeira," Coimbra, Almedina, 2010, pages 103-106, PEDRO CAETANO NUNES, "Jurisprudencia sobre o dever de leadade dos administradores," II Congresso Direito das Sociedades em Revista, Coimbra, Almedina, 2012, page 201, and, within the scope of the previous legislation, INOCÊNCIO GALVÃO TELLES, "Contrato consigo mesmo e negociação de directores ou gerentes de sociedades anónimas ou por quotas com as respectivas sociedades," RLJ, year 100, 1967.

**192.**

Application by analogy of article 397, no. 2 of the Code of Commercial Companies to situations of dual representation has been accepted by the jurisprudence, specifically by the Decision of the Court of Appeals of Évora on June 19, 2008, published in www.dgsi.pt, case no. 521/08-2.

**193.**

Therefore, the contract that established the PLEDGE is null and void, based on the provision in article 397, no. 2, of the Code of Commercial Companies.

**194.**

As a mere precaution, in the event that it is understood that the provision in article 397, no. 2, of the Code of Commercial Companies is not applicable through analogy, then article 261, no. 1, of the Civil Code would apply, with the sanction of annulability, a sanction that the Plaintiff Partran is invoking, on a subsidiary basis.

G. **Ineffectiveness of the pledge pursuant to article 269 of the Civil Code –** *Abuse of representation*

**195.**

The contract that established the PLEDGE was executed through the abuse of representation, for the purposes of article 269 of the Civil Code.

**196.**

41/72


The regime governing abuse of representation, established in article 269 of the Civil Code, is applicable to the representation of commercial companies, in accordance with the settled understanding of the doctrine and jurisprudence.

### 197.

Among legal scholars, see: RAÚL VENTURA. *Sociedades por quotas,* III, Coimbra, Almedina, 1991, pages 175-176, CARLOS FERREIRA DE ALMEIDA, *Contratos,* I, 5th edition, Coimbra, Almedina, 2013, pages 165-166, and JOSÉ ENGRÁCIA ANTUNES, "*O abuso de representação como limite aos poderes dos gerentes,*" *Estudos em homenagem ao Prof. Doutor José Lebre de Freitas,* Coimbra, Coimbra Editora, 2013, pages 265-315.

### 198.

Noteworthy among jurisprudence is the Decision by the Supreme Court of Justice of February 27, 2014, available at www.dgsi.pt, case no. 1835/07.9TBOA7.P1.S1.

### 199.

Article 269 of the Civil Code establishes as requirements the abuse of representation and the knowledge or duty to know of the abuse by the third party.

### 200.

In regard to the requirements for configuration of abuse of representation, see, among others, CARLOS FERREIRA DE ALMEIDA, *Contratos,* I, 5th edition, Coimbra, Almedina, 2013, pages 163-166, ANTÓNIO MENEZES CORDEIRO, *Tratado de direito civil português*, I, volume IV, Coimbra, Almedina, 2005, pages 111-113, and CARLOS ALBERTO DA MOTA PINTO, ANTÓNIO PINTO MONTEIRO and PAULO MOTA PINTO, *Teoria geral do direito civil*, 4th edition, Coimbra, Almedina, 2005, page 550.

### 201.

One of the typical situations of abuse is acting against the interests of the party represented.

### 202.

42/72

34



Now, in the case in question, the representatives of the Plaintiff Partran acted in clear violation of their duties of care and of loyalty, pursuing interests opposed to those of the Plaintiff Partran and of its creditors (pursuant to article 64 of the Code of Commercial Companies).

### 203.

The pursuit of interests opposing those of the Plaintiff Partran and its creditors is notorious, since the credit guaranteed was not established to satisfy any needs or interests of the Plaintiff Partran, but instead, those of third parties.

### 204.

In addition, as noted, on the date the PLEDGE was established, the Plaintiff ESFG was already in a situation of breach of its obligations, and therefore, it was very likely that the PLEDGE would be enforced and the Plaintiff Partran would become insolvent.

### 205.

In regard to knowledge or the duty to know by a third party, it is our position that not only was it alleged that the representatives of BES knew that the contract that established the PLEDGE was harmful to the Plaintiff Partran,

### 206.

But that on a subsidiary basis, it was also claimed that the BES representatives could not have helped but know, if they acted with a minimum of diligence, that the contract that established the PLEDGE was harmful to the Plaintiff Partran.

### 207.

We will now return to the problem of imputation of subjective states to legal entities, emphasizing that it is sufficient to affirm knowledge or the duty to know on the part of one of the directors.

### 208.

Within this latter context, it can be added that the knowledge that the contract that established the PLEDGE was harmful to the Plaintiff Partran is particularly evident in the person of the then President of

43/72


the Executive Commission of BES.

**209.**

Therefore, we conclude in favor of the ineffectiveness of the contract that established the PLEDGE, based on the provisions in articles 269 and 268, no. 1, of the Civil Code.

H. **Ineffectiveness of the pledge pursuant to article 409, no. 2, of the Code of Commercial Companies –** *Activity outside the company purpose*

**210.**

The contract that established the PLEDGE is not binding on the Plaintiff Partran, due to the provision in article 409, no. 2, of the Commercial Company Code.

**211.**

The requirements for application of article 409, no. 2, of the Commercial Company Code is action outside the company purpose and knowledge or duty to know this fact by the third party.

**212.**

In regard to this regime, see among others, ALEXANDRE DE SOVERAL MARTINS, in JORGE COUTINHO DE ABREU (Coordination), *Código das Sociedades Comerciais em Comentário,* vol. VI, Coimbra, Almedina, 2013, pages 480-484, and ANTÓNIO MENEZES CORDEIRO, *Código das Sociedades Comercias anotado*, 2nd edition, Coimbra, Almedina, 2011, page 1081.

**213.**

In regard to the first requirement - action outside the company purpose - we see that the Plaintiff Partran is a holding company, and that its company purpose is the management of shares owned in other companies, as an indirect form of the exercise of economic activities,

**214.**

And the establishment of the PLEDGE is not necessary to achieve this company purpose.

**44/72** 36


**215.**

Moreover, as we have noted, the provision of a guarantee by a holding company in companies in which it does not own shares is even prohibited by law.

**216.**

In regard to the second requirement - knowledge or duty to know this fact by the third party - we find that not only was it alleged that the representatives of BES knew that the company purpose of the Plaintiff Partran was being exceeded,

**217.**

But also, on a subsidiary basis, it was alleged that the representatives of BES had to know, if they had acted with a minimum degree of diligence, that the company purpose of the Plaintiff Partran was being exceeded.

**218.**

Here we also return to the problem of imputation of subjective states to legal entities, repeating that it is sufficient to affirm knowledge or the duty to know on the part of just one of the directors.

**219.**

It should be added that it is particularly evident in the then President of the BES Executive Commission that knowledge that the contract that established the PLEDGE was not essential in light of the company purpose of the Plaintiff Partran.

**220.**

The applicable legal sanction is ineffectiveness, since this constitutes a sub-species of abuse of representation (in regard to this, see, among others, CARLOS FERREIRA DE ALMEIDA, *Contratos,* I, 5th edition, Coimbra, Almedina, 2013, pages 165, and ALEXANDRE DE SOVERAL MARTINS, in JORGE COUTINHO DE ABREU (Coordination), *Código das Sociedades Comerciais em Comentário,* vol. VI, Coimbra, Almedina, 2013, page 484).

**221.**

45/72


Therefore, we conclude in favor of the ineffectiveness of the contract that established the PLEDGE, pursuant to article 409, no. 2, of the Code of Commercial Companies.

I.     **Nullity, annulability and ineffectiveness. Restitution in kind or restitution of value. Indemnification**

### 222.

Nullity can be invoked by any interested party, pursuant to the terms of article 286 of the Civil Code, and all the Plaintiffs have a private interest in invoking these nullities (see also the provision in article 605 of the Civil Code).

### 223.

Under article 287, no. 1, of the Civil Code, the Plaintiff Partran has standing to argue the annulability established in article 261, no. 1, of the Civil Code, since it is the party in whose interest it was created.

### 224.

The Plaintiff Partran has standing to argue the legal ineffective grounds set forth in article 269 of the Civil Code and in article 409, no. 2, of the Code of Commercial Companies, since it is the party in whose interest they were created.

### 225.

Pursuant to article 289 of the Civil Code, a declaration of nullity, annulability and the declaration of ineffectiveness have retroactive effects, leading to the restitution of whatever was provided, or, if restitution in kind is not possible, then restitution of the corresponding value.

### 226.

The sanctions of nullity, annulability and ineffectiveness apply to the pledge contract, in which the parties are the Plaintiff Partran, as pledger, and BES (although replaced by the Defendant Novo Banco), as unsecured creditor.

### 227.


This PLEDGE contract is stated in clause 16 (PLEDGE CLAUSE) of the document entitled ""*Amendment and re-formalization of the Financing and Guarantee Deposit Contract*" and is dated July 2, 2014 (CONTRACT).

**228.**

The physical inclusion of the pledge in a broader document does not affect its legal autonomy, as a typical legal contract, which has as its parties the pledger and the unsecured creditor.

**229.**

As a mere legal precaution, in the event the Court were to understand that the pledge contract does not have legal autonomy, but is a mere component of a broader contract as executed by BES, by the Plaintiff ESFG and by the Plaintiff Partran, for the aforementioned CONTRACT, we affirm, on a subsidiary basis, that the sanctions of nullity, annulabiltiy and ineffectiveness would still have to apply to the CONTRACT.

**230.**

The PLEDGE ENFORCEMENT CONTRACT is null and void, due to a sequential nullity, pursuant to article 289 of the Civil Code.

**231.**

It is equally correct to consider that the PLEDGE ENFORCEMENT CONTRACT is null and void, due to the provision in article 892 of the Civil Code, since it constitutes a sale of third party goods.

**232.**

In addition to being null and void, the PLEDGE ENFORCEMENT CONTRACT is ineffective in relation to the Plaintiff Partran, as the legitimate owner of the Tranquilidade shares, as is well explained by, among others, FERNANDO PIRES DE LIMA and JOAO ANTUNES VARELA, *Código Civil anotado*, II, 3rd edition, Coimbra, Coimbra Editora, 1986, page 189 and MANUEL CARNEIRO DA FRADA, in ANTÓNIO MENEZES CORDEIRO (Coordination), Direito das obrigações, III, 2nd edition, Lisbon, AAFDL, 1991, page 53.

**233.**

47/72


The rights of the Defendant Calm Eagle, as a third party, do not merit protection, since it acted in bad faith (in accordance with the provisions in articles 291 and 892 of the Civil Code and in article 58 of the Securities Code).

**234.**

The Plaintiff Partran is entitled to restitution in kind for the Tranquilidade shares, under articles 289 and 1311 of the Civil Code, and both Defendants should be ordered to make restitution.

**235.**

Among the effects of the declaration of nullity is the cancellation of the registration of purchase of the Tranquilidade shares in favor of the Defendant Calm Eagle (in accordance with the provision in article 76 of the Securities Code) and the reconstitution of the purchase record in favor of the Plaintiff Partran, without the encumbrance of the pledge.

**236.**

If it is not possible to obtain restitution in kind for the Tranquilidade shares, the Plaintiff Partran is entitled to their value, pursuant to the terms already mentioned in article 289 of the Civil Code.

**237.**

Therefore, on a subsidiary basis to restitution in kind, the Defendant Novo Banco should be ordered to pay to the Plaintiff Partran an amount corresponding to the value of the Tranquilidade shares.

**238.**

If it is not possible to obtain restitution in kind of the Tranquilidade shares, the Defendant Calm Eagle should also be ordered to make payment to the Plaintiff Partran of an amount corresponding to the Tranquilidade shares, pursuant to article 483 (offense against the right of property) and of article 334 (intentional offense against good customs), both from the Civil Code.

**239.**

At this time, the Plaintiff Partran does not know the exact value of the Tranquilidade shares, therefore, it will leave its liquidation for a later time.



J.     **ESAF Operation: enforcement of pledge with violation of duties of loyalty and diligence; enrichment without case**

### 240.

Neither the restitution of the Tranquilidade shares, nor the restitution of their value, both allowed under the aforementioned article 289 of the Civil Code, allow the Plaintiff Partran to fully protect its interests and those of its creditors.

### 241.

For this reason, together with the request for either restitution of the Tranquilidade shares or for an order to pay their value, we are requesting that the Defendant Novo Banco pay an indemnification to the Plaintiff Partran.

### 242.

The factual basis for this request indemnification lies in the sale operation by BES of the ESAF shares and in the later placement of the ESAF shares in the enforcement of the PLEDGE by the Defendant Novo Banco.

### 243.

The legal basis for this request for indemnification lies in the violation of the duties of loyalty and diligence in the enforcement of the PLEDGE, and as a subsidiary cause of action, in the enrichment without cause.

We will explain this below:

### 244.

Within the scope of the legal relationship between the pledger and the unsecured creditor, the out of court enforcement of the pledge, established in article 675 of the Civil Code, establishes the inclusion in the legal sphere of the unsecured creditor of certain duties of diligence and loyalty.

### 245.

Some legal scholars place the basis for these duties of diligence and loyalty on the rules of conduct of good faith, such as LUIS PESTANA DE VASCONCELOS, *Direito das garantias,* 2nd edition, Coimbra,


Almedina, 2015, page 254, TIAGO SOARES DA FONSECA, *O penhor de acções*, Coimbra, Almedina, 2005, pages 116-117, and apparently, CATARINA MONTEIRO PIRES "A execução extraprocessual do penhor – os casos particulares dos penhores de acções e de quotas," *O Direito,* year 142, 2010, III, pages 557-558 and 561.

**246.**

Other legal scholars affirm that these duties of diligence and loyalty are extremely intense, supplanting the requirements of the rule of conduct of good faith.

**247.**

Some legal scholars place these duties in a legal relationship of special trust, a sort of fiduciary type relationship, such as MANUEL CARNEIRO DA FRADA, *Teoria da confiança e responsabilidade civil*, Coimbra, Almedina, 2004, pages 544-559 and PEDRO CAETANO NUNES, "Jurisprudencia sobre o dever de lealdade dos administradores," II *Congresso Direito das Sociedades em Revista*, Coimbra, Almedina, 2012, pages 184-187 (see also the reference to *Emächtigungstreuhand* in PEDRO PAIS DE VASCONCELOS, *Contratos atípicos,* Coimbra, Almedina, 2002, page 256).

**248.**

What is the reason for putting them in a fiduciary relationship?

**249.**

This is because the out of court enforcement of the pledge implies the attribution to the unsecured creditor of a power of disposal over third party property not only in his interest but in the interest of the pledger.

**250.**

There is a risk that the unsecured creditor will abuse his power, using it in his exclusive personal interest, to the detriment of the pledger.

**251.**

Therefore, there is a disproportionate relationship between the means and purposes and a risk of the abuse of power.



**252.**

And the only way to protect the interests of the pledger is the imposition of particularly strong duties of diligence and loyalty on the unsecured creditor.

**253.**

These fiduciary duties of diligence and loyalty result from article 675 of the Civil Code itself, since it considers that the attribution of fiduciary powers of disposal means subjecting the corresponding duties to a fiduciary obligation.

**254.**

Since the Defendant Novo Banco also acted as a financial intermediary with the Plaintiff Partran, since the Tranquilidade shares were deposited in a share registration account at the Defendant Novo Banco, these fiduciary duties of diligence and loyalty also result from article 304, no. 2, of the Securities Code.

**255.**

For those who prefer to place these duties of diligence and loyalty in good faith, the legal basis is in articles 227 and 762, no. 2, of the Civil Code.

**256.**

These duties, whether based on article 675 of the Civil Code, or on article 304, no. 2, of the Securities Code, or on articles 227 and 762, no. 2, of the Civil Code, remain in effect even if the pledge is null, annullable or ineffective.

**257.**

Returning to the case in question, we see that the duties of diligence and loyalty required that the Defendant Novo Banco repurchase the ESAF shares from Tranquilidade for the initial sales price, before concluding the sale of Tranquilidade, so as not to harm the Plaintiff Partran.

**258.**

Therefore, the Defendant Novo Banco should indemnify the Plaintiff Partran, pursuant to the terms of article 798 of the Civil Code, for the violation of its duties of diligence and loyalty in the enforcement of the PLEDGE.


**259.**

The damage corresponds to the difference between the sale price of the ESAF shares by BES to Tranquilidade – 29.7 million Euros, and their actual value on the date of this sale.

**260.**

If it is not possible to make restitution in kind of the Tranquilidade shares, and the PLEDGE ENFORCEMENT CONTRACT remains in effect, then the damage will correspond to the difference between the value of the sale of the ESAF shares by BES to Tranquilidade, 29.7 million Euros, and the amount actually imputed to these shares in the price of the PLEDGE ENFORCEMENT CONTRACT.

**261.**

As a subsidiary cause of action, the Plaintiff Partran is entitled to these same amounts under the rules of enrichment without cause, established in articles 473 et seq. of the Civil Code.

**262.**

The Plaintiff Partran does not know at this time the exact value of the Tranquilidade shares, and therefore, it will leave its liquidation for a later time.

**K.      Defective enforcement of pledge**

**263.**

In the event that the requests for a declaration of nullity, annulabilty and a declaration of ineffectiveness of the pledge contract are denied, the Plaintiff Partran, merely as an exercise of caution by its counsel, hereby requests an indemnification for violation of the duties of diligence and loyalty in the enforcement of the PLEDGE.

**264.**

As the legal basis for this claim, we invoke the aforementioned 675 of the Civil Code, or article 304, no. 2, of the Securities Code, or the aforementioned article 762, no. 2, of the Civil Code.


**265.**

The aforementioned duties of diligence and loyalty required the Defendant Novo Banco to open the sale process to all possible buyers, in order to avoid a reduction in the price of the Tranquilidade shares, to the detriment of the Plaintiff Partran.

**266.**

Or, at a minimum, it should have previously assessed the value of the Tranquilidade shares, to ensure that it did not sell them at a lower price.

**267.**

These duties of diligence and loyalty also required that the Defendant Novo Banco demand immediate payment of the Defendant Calm Eagle of all the components of the price.

**268.**

Express reference is made to the fact that, in enforcing the pledge, unsecured creditors must not sell the object without immediate payment of the price, under the penalty of having to indemnify the pledger, by ADRIANO VAZ SERRA, *Penhor de coisas – Penhor de direitos, separata do Boletim do ministério da Justiça*, 1956, pages 244-246.

**269.**

The Defendant Novo Banco ostensibly violated this duty, and allowed the delay of payment of the components of the price relative to the ESAF and Contact assets.

**270.**

These components make up a substantial part of the total price.

**271.**

Therefore, on a subsidiary basis to all the previous requests, Defendant Novo Banco should indemnify the Plaintiff Partran, pursuant to article 798 of the Civil Code, for the violation of its duties of diligence and loyalty in the enforcement of the PLEDGE.

**272.**


The damage corresponds to the difference between the price immediately obtained from the sale of the Tranquilidade shares – 25 million Euros, and the amount that would have been obtained if the sale process had been open to all possible buyers and immediate payment of all components of the price had been required.

**273.**

The Plaintiff Partran does not know at this time the exact value of the Tranquilidade shares, and therefore, it will leave its liquidation for a later time.

**274.**

The request for indemnification of these damages is joint with the request relative to the ESAF operation.

**275.**

In other words, the aforementioned duties of diligence and loyalty also required that the Defendant Novo Banco had repurchased the ESAF shares from Tranquilidade before concluding the sale of Tranquilidade, so as not to harm the Plaintiff Partran.

**276.**

Here the damage corresponds to the difference between the value of the sale of the ESAF shares by BES to Tranquilidade - 29.7 million Euros, and the amount actually imputed to these shares in the price of the PLEDGE ENFORCEMENT CONTRACT.

**277.**

The Plaintiff Partran does not know at this time the exact value of the Tranquilidade shares, and therefore, it will leave its liquidation for a later time.

IV.    **CLAIM**

Based on the foregoing, the Court should:

I. As the principal request:

a) Declare the nullity of the pledge contract contained in Clause 16 (PLEDGE CLAUSE) of the contract executed by Banco

54/72                                                          46



Espírito Santo, S.A., by the Plaintiff ESFG and by the Plaintiff Partran, dated July 2, 2014 (the CONTRACT).

b) On a subsidiary basis to the claim made in a), annul the pledge contract in Clause 16 (PLEDGE CLAUSE);

c) On a subsidiary basis to the claim made in a) and b), declare the ineffectiveness of the pledge contract in Clause 16 (PLEDGE CLAUSE);

II.  On a subsidiary basis to claims 1.a), 1.b) or 1.c):

d) Declare the nullity of the contract executed by Banco Espírito Santo, S.A., by the Plaintiff ESFG and by the Plaintiff Partran, dated July 2, 2014 (the CONTRACT);

e) On a subsidiary basis to the claim made in d), annul the CONTRACT;

f) On a subsidiary basis to the claim made in d) and e), declare the ineffectiveness of the CONTRACT;

III.  Together with all the prior claims:

g) Declare the nullity of the contract executed on September 12, 2014, by the Defendant Novo Banco and by the Defendant Calm Eagle, through which the shares in Companhia de Seguros Tranquilidade, S.A. were transmitted (PLEDGE ENFORCEMENT CONTRACT);

h) On a subsidiary basis to the claim made in g), declare the ineffectiveness of the PLEDGE ENFORCEMENT CONTRACT;

IV Together with all the prior claims:

i) Order the Defendants Novo Banco and Calm Eagle to return the shares of Companhia de Seguros Tranquilidade, S.A. to the Plaintiff Partran;

j) Order the cancellation of the share purchase record of Companhia de Seguros Tranquilidade, S.A., in favor of the Defendant Calm Eagle;


k) Order reconstitution of the share purchase record of Companhia de Seguros Tranquilidade, S.A. in favor of the Plaintiff Partran, without the encumbrance of the pledge;

V.  Also together with all the prior claims:

l) Order the Defendant Novo Banco to pay the Plaintiff Partran the difference between the sale price of the ESAF shares – Espírito Santo Activos Financieros, S.G.P.S., S.A., by Banco Espírito Santo, S.A. to Companhia de Seguros Tranquilidade, S.A. - 29.7 million Euros, and the actual value of these shares on the sale date, to be liquidated at a later time;

VI. Together with claims I.a), I.b), I.c), II.d), II.e) or II.f), or on a subsidiary basis to claims III.g), III.h), IV.i), IV.j), IV.k) and V.l):

m) Order the Defendant Novo Banco and by the Defendant Calm Eagle to pay the value corresponding to the shares of Companhia de Seguros Tranquilidade, S.A. to the Plaintiff Partran, to be liquidated at a later time;

VII. Together with claims I.a), I.b), I.c), II.d), II.e) or II.f), or on a subsidiary basis to claims III.g), III.h), IV.i), IV.j), IV.k) and V.l) and together with claim VI.m):

n) Order the Defendant Novo Banco to pay to the Plaintiff Partran the difference between the sale price of the ESAF shares – Espírito Santo Activos Financieros, S.G.P.S., S.A., by Banco Espírito Santo, S.A., to Companhia de Seguros Tranquilidade, S.A. - 29.7 million Euros, and the amount actually imputed to these shares in the price of the Pledge Enforcement Contract, to be liquidated at a later time;

VIII.  On a subsidiary basis to all these claims:

o) Order the Defendant Novo Banco to pay to the Plaintiff Partran an

WATER STREET TRANSLATIONS

indemnification for the violation of the duties of and loyalty in the enforcement of the Pledge Contract, to be liquidated at a later time;

IX.  Subsidiary to claims I.a), I.b), I.c), II.d), II.e), II.f), III.g), III.h), IV.i), IV.j), IV.k), V.l), VI.m) VI.n) and together with claim VIII.o):

>   p) Order the Defendant Novo Banco to pay to the Plaintiff Partran the difference between the sale price of the ESAF shares – Espírito Santo Activos Financieros, S.G.P.S., S.A., by Banco Espírito Santo, S.A., to Companhia de Seguros Tranquilidade, S.A. - 29.7 million Euros, and the amount actually imputed to these shares in the price of the Pledge Enforcement Contract, to be liquidated at a later time;

X.  In any case, order the Defendants to pay the court costs and whatever other charges are mandated by the law.

**REQUESTS FOR PRESENTATION OF EVIDENCE:**

**-Documental evidence:**

Pursuant to the terms of article 429 of the Code of Civil Procedure, we ask that the following notifications be made:

a)  of the Defendant Calm Eagle, to add to the record the letter dated May 23, 2014, prepared by Apollo, with a non-binding offer of 228 million Euros for the Tranquilidade shares;

b)  of the Defendant Novo Banco and the Defendant Calm Eagle, to add to the record the contract through which BES sold to Tranquilidade shares representing 10% of the capital stock of ESAF - Espírito Santo Activos Financieros, S.G.P.S., S.A.;

c)  of the Defendant Novo Banco and the Defendant Calm Eagle, to add to the record all correspondence, including electronic correspondence, relative to the sale process to Tranquilidade of the shares representing 10% of the capital stock of ESAF - Espírito Santo Activos Financieros, S.G.P.S., S.A. and the later resale process of these same shares;

57/72 49


d) of the Defendant Novo Banco and the Defendant Calm Eagle, to add to the record all recordings and any transcriptions of the phone calls relative to the sale process to Tranquilidade of the shares representing 10% of the capital stock of ESAF - Espírito Santo Activos Financieros, S.G.P.S., S.A., and the later resale process of these same shares;

e) of the Defendant Novo Banco and the Defendant Calm Eagle, to add to the record all documents relative to the company deliberations in regard to the sale process to Tranquilidade of the shares representing 10% of the capital stock of ESAF - Espírito Santo Activos Financieros, S.G.P.S., S.A., and the later resale process of these same shares;

f) of the Defendant Novo Banco, to add to the record all correspondence, including electronic correspondence, exchanged with Banco de Portugal, relative to the sale process to Tranquilidade of the shares representing 10% of the capital stock of ESAF - Espírito Santo Activos Financieros, S.G.P.S., S.A., and the later resale process of these same shares;

g) of the Defendant Novo Banco and the Defendant Calm Eagle, to add to the record, in its entirety, the contract executed on September 12, 2014, called the "Share Purchase and Sale Agreement," through which the Defendant Novo Banco, in its capacity as unsecured creditor, sold to Calm Eagle, and through which the latter purchased the Tranquilidade shares;

h) of the Defendant Novo Banco and the Defendant Calm Eagle, to add to the record all correspondence, including electronic correspondence, relative to the negotiation of the sales price structure for the Tranquilidade shares;

i) of the Defendant Calm Eagle, to add to the record the most recent account statement in which the ownership of the Tranquilidade shares is registered;

**-Evidence through Testimony:**

Pursuant to the terms of article 452 of the Code of Civil Procedure, we request that the following person be called to testify:

1) Eduardo Stock da Cunha, President of the Board of Directors of the Defendant Novo Banco S.A., in regard to articles 90, 93 to 96, 99 to 102, 104, 107 to 121, and 124 to 128 of this motion, to be served notice at the headquarters of the Defendant Novo Banco.



**-Evidence through declarations of parties:**

Pursuant to the terms of article 466 of the Code of Civil Procedure, we request that statements be given by the following parties:

1) Caetano Beirão da Veiga, President of the Board of Directors of the Plaintiff Partran, SGPS., S.A., in regard to the matters in articles 18 to 20, 22 to 27, 33 to 38 and 43 to 133 of this motion, to be served notice at the headquarters of the Plaintiff Partran.

2) Laurence Jacques, Attorney, Judicial Liquidator of the Plaintiff Espírito Santo Financial Group, S.A., with professional domicile at 35 Avenue Monterey, L-2163 Luxembourg, in regard to the same matter, through a video conference, pursuant to Regulation no. 1206/2001, of the Council, of May 28, 2001;

3) Pedro Pidwell, Insolvency Administrator of the Plaintiff Espírito Santo Financial (Portugal), SGPS S.A., with professional domicile at Rua do Mercado, Bloco 3, 2, DT. Apartado 204, 3781-909 Anadia, in regard to the same matter.

In the event that any of those mentioned no longer carry out these functions, we hereby request that they be questioned as witnesses.

**-Expert evidence:**

Pursuant to the terms of articles 467 et seq. of the Code of Civil Procedure, we request the presentation of group expert evidence, based on the matters alleged in articles 93, 94, 95, 96, 97, 101, 102, 104, 105, 106, 107, 123 and 129 of this Complaint.

After the admission of the right to present expert evidence, we ask that the Plaintiffs be notified to indicate an expert.

**-Witness evidence:**

The following witnesses are indicated:

1) Bernard Basecqz, with professional domicile at 1 Rue Plaetis, L-2338 Luxembourg, through a video conference, pursuant to Regulation no. 1206/2001, of the Council, of May 2001;

2) Fernando Pereira Braga Pereira Coutinho, with professional domicile at Av. da Liberdade no, 195, 1250-142, Lisbon, with notification requested pursuant to


article 507, no. 2, of the Code of Civil Procedure;

3) Teresa de Souza, with professional domicile at Av. da Liberdade no. 195, 1250-142, Lisbon, with notification requested pursuant to article 507, no. 2, of the Code of Civil Procedure;

4) Filipe Worsdell, to appear;

5) Luis Costa Ferreira, with professional domicile at Rua do Comércio, no. 148, 1100-148, Lisbon, with notification requested pursuant to article 507, no. 2, of the Code of Civil Procedure;

6) Pedro Miguel de Seabra Duarte Neves, Vice-Governor of Banco de Portugal, with professional domicile at Rua do Comércio, no. 148, 1100-148, Lisbon, with notification requested pursuant to article 507, no. 2, of the Code of Civil Procedure;

7) Pedro Beauvillain Brito e Cunha, with professional domicile at Av. da Liberdade no. 242, 1250-149, Lisbon, with notification requested pursuant to article 507, no. 2, of the Code of Civil Procedure;

8) Gustavo Alexandre Pontes Teixeira de Mesquita Guimarães, with professional domicile at Av. da Liberdade no. 242, 1250-149, Lisbon, with notification requested pursuant to article 507, no. 2, of the Code of Civil Procedure;


**AMOUNT IN CONTROVERSY:** EUR 50,000.01

**ATTACHED:** 3 Powers-of-attorney, 1 Delegation of authority, DUC and proof of the respective payment, and 41 documents.

The Attorneys,

**Nuno Líbano Monteiro**      **Manuela Tavares Morais**      **Pedro Caetano Nunes**

## CERTIFICATION OF ACCURACY OF TRANSLATION

This hereby confirms that the foregoing translation was prepared by Kathy Mutz, a linguist with substantial experience in the translation of documents from Portuguese into English as certified by the American Translators Association.

Kent G. Heine, Managing Partner of Water Street Translations, LLC, hereby attests to the following:

"To the best of my knowledge and belief, the foregoing translation is a true, accurate, and unbiased translation into English of the Portuguese text attached herewith."


Kent G. Heine
Water Street Translations, LLC


February 28, 2021

Date





Tribunal Judicial da Comarca de Lisboa

Instância Central de Lisboa

1ª Secção Cível

Exmo. Senhor

Juiz de Direito

PARTRAN, S.G.P.S., S.A., com sede na Rua de São Bernardo, n.º 62, 1200-826 Lisboa, pessoa colectiva n.º 502.272.112, registada na Conservatória do Registo Comercial de Lisboa sob o mesmo número,

MASSA INSOLVENTE DA ESPÍRITO SANTO FINANCIAL GROUP, S.A., sociedade anónima constituída ao abrigo das leis do Luxemburgo, com sede em Boulevard Royal, 22-24, L-2449 Luxembourg, no Luxemburgo, inscrita no Registo de Comércio e de Sociedades do Luxemburgo sob o n.º B 22.232, representada pela Liquidatária Judicial Dra. Laurence Jacques, e

MASSA INSOLVENTE DA ESPÍRITO SANTO FINANCIAL (PORTUGAL), S.G.P.S., S.A., com sede na Rua de São Bernardo, n.º 62, 1200-826 Lisboa, pessoa colectiva n.º 502.412.631, registada na Conservatória do Registo Comercial de Lisboa sob o mesmo número, representada pelo Administrador de Insolvência Dr. Pedro Pidwell, vêm propor e fazer seguir

## ACÇÃO DECLARATIVA DE PROCESSO COMUM

contra NOVO BANCO, S.A., com sede na Av. da Liberdade, n.º 195, 1250-142 Lisboa, pessoa colectiva n.º 513.204.016, registada na Conservatória do Registo Comercial de Lisboa sob o mesmo número, e

CALM EAGLE HOLDINGS, S.À.R.L., sociedade anónima constituída ao abrigo das leis do Luxemburgo, com sede na Rua Guillaume Kroll 5, L-1855 Luxembourg, no Luxemburgo, inscrita no Registo de Comércio e de Sociedades do Luxemburgo sob o n.º B 189.885.

O que fazem nos termos e com os fundamentos seguintes:



PLMJ
SOCIEDADE DE ADVOGADOS, RL
A.M.PEREIRA, SÁRAGGA LEAL, OLIVEIRA MARTINS, JÚDICE
E ASSOCIADOS

## I. INTRODUÇÃO

**1.º**

A Autora Partran, S.G.P.S., S.A. (doravante Partran) tem como accionistas a Autora Espírito Santo Financial Group, S.A. (doravante ESFG) e a Autora Espírito Santo Financial (Portugal), SGPS, S.A. (doravante ESF(Portugal)).

**2.º**

A Autora Partran era a única accionista da Companhia de Seguros Tranquilidade, S.A. (doravante Tranquilidade).

**3.º**

E fazia parte do correntemente (mas não tecnicamente) denominado Grupo Espírito Santo.

**4.º**

Em vésperas do colapso do Grupo Espírito Santo, a Autora Partran constituiu um penhor financeiro (doravante PENHOR) sobre as acções da Tranquilidade a favor do Banco Espírito Santo, S.A. (doravante BES).

**5.º**

O PENHOR foi constituído com a intenção de beneficiar o BES, em prejuízo dos credores das Autoras.

**6.º**

Sendo um acto fraudulento contra credores.

**7.º**

Pelo que é nulo.

**8.º**


Nada, de um ponto de vista jurídico, ou sequer de um ponto de vista moral ou ético, legitima a prevalência dos interesses do BES – e agora do Novo Banco, S.A. (doravante Novo Banco) - e dos seus credores face aos interesses dos credores das Autoras.

### 9.º
Os credores das Autoras não têm qualquer ligação à denominada "Família Espírito Santo".

### 10.º
Inclusivamente, muitos deles são investidores individuais.

### 11.º
É absolutamente inadmissível, num Estado de Direito, o favorecimento de credores em prejuízo de outros.

### 12.º
O actual Presidente do Conselho de Administração da Autora Partran não subscreveu o contrato de constituição do PENHOR, nem sequer exercia funções à data de celebração do contrato.

### 13.º
Quer a Autora ESFG, quer a Autora ESF(Portugal) foram entretanto declaradas insolventes.

### 14.º
As Autoras encontram-se comprometidas com a defesa dos interesses dos seus credores.

### 15.º
<u>É este imperativo de defesa dos interesses dos credores que determina a instauração da presente acção.</u>

### 16.º
A petição inicial tem a seguinte estrutura:

I.   INTRODUÇÃO

11/72

II.    DOS FACTOS

    A.    Celebração do contrato constitutivo do penhor

    B.    Prejuízo para os credores

    C.    Dolo e má-fé

    D.    Transmissão do penhor

    E.    Execução do penhor e operação ESAF

    F.    Má-fé do adquirente do bem penhorado

III.    DO DIREITO

    A.    Nulidade do penhor por violação do artigo 19.º do Regime Jurídico dos Acordos de Garantia Financeira – *Acto fraudulento contra credores*

    B.    *Segue*: Imputação do dolo e da má-fé dos representantes às pessoas colectivas

    C.    Nulidade do penhor por violação do artigo 5.º, n.º 1, alínea c), do Regime Jurídico das Sociedades Gestoras de Participações Sociais – *Proibição de concessão de crédito pelas SGPS*

    D.    Nulidade do penhor por violação dos artigos 4.º, n.º 1, alínea b), e 8.º, n.º 2, do Regime Geral das Instituições de Crédito e Sociedades Financeiras – *Operações bancárias*

    E.    Nulidade do penhor por violação do artigo 6.º, n.º 1 e n.º 3, do Código das Sociedades Comerciais – *Princípio da especialidade*

    F.    Nulidade do penhor por violação do artigo 397.º, n.º 2, do Código das Sociedades Comerciais (ou anulabilidade por violação do artigo 261.º, n.º 1, do Código Civil) – *Negócio consigo mesmo*

    G.    Ineficácia do penhor ao abrigo do artigo 269.º do Código Civil – *Abuso da representação*

    H.    Ineficácia do penhor ao abrigo do artigo 409.º, n.º 2, do Código das Sociedades Comerciais – *Actuação que extravasa o objecto social*

    I.    Nulidade, anulabilidade e ineficácia. Restituição em espécie ou restituição do valor. Indemnização

    J.    Operação ESAF: execução do penhor com violação de deveres de lealdade e de diligência; enriquecimento sem causa

    K.    Execução defeituosa do penhor

IV.    PEDIDO


## II.    DOS FACTOS


### A.    Celebração do contrato constitutivo do penhor

12/72


**17.º**

A Autora Partran é uma sociedade gestora de participações sociais, que tem por objecto a "gestão de participações sociais noutras sociedades, como forma indirecta de exercício de actividades económicas" (*vide* Certidão Permanente do Registo com o código de acesso n.º 3786-4157-6814, acessível em https://www.portaldaempresa.pt/CVE/Services/Online/Pedidos.aspx?service=CCP, de que se junta cópia, como **Doc. n.º 1**).

**18.º**

A Autora Partran era detentora de acções representativas da totalidade do capital social da Tranquilidade (**Doc. n.º 2**, na página 12).

**19.º**

A Autora ESFG era e é detentora de acções representativas de 55% do capital social da Autora Partran (**Doc. n.º 2**, na página 12).

**20.º**

A Autora ESF(Portugal) era e é detentora de acções representativas dos restantes 45% do capital social da Autora Partran (**Doc. n.º 2**, na página 12).

**21.º**

A Autora ESFG tinha e tem a sua sede estatutária e efectiva no Luxemburgo (**Doc. n.º 3**).

**22.º**

Com data de 2 de Julho de 2014, o BES, a Autora ESFG e a Autora Partran celebraram um acordo escrito (doravante CONTRATO), denominado "*Aditamento e reformalização de Contrato de Depósito em Garantia e de Financiamento*" (**Doc. n.º 4**).

**23.º**

Na cláusula 16.ª do CONTRATO estipulou-se um contrato de penhor, nos termos do qual, "*para garantia do bom pagamento de todas as responsabilidades que advêm para a ESFG, directa ou indirectamente, do não cumprimento pontual e integral de qualquer obrigação para ela resultante do*

13/72

5



Crédito, (...) a Partran constitui, a favor do BES, penhor financeiro de primeiro grau sobre as acções"
da Tranquilidade (doravante CLÁUSULA DE PENHOR).

### 24.º

O PENHOR não foi constituído para garantir uma dívida da Autora Partran, mas sim para cobertura de uma dívida da Autora ESFG (como resulta do excerto do CONTRATO ora transcrito).

### 25.º

Ou seja, a Autora Partran não estava a assumir uma dívida própria, mas sim a prestar uma garantia real por dívidas alheias.

### 26.º

Sendo que, por seu turno, a Autora ESFG também não estava a assumir riscos que eram próprios, mas sim riscos associados à concessão de crédito a determinadas *holdings* da denominada "Família Espírito Santo" – as sociedades luxemburguesas Espírito Santo International, S.A. (doravante ESI) e Rio Forte Investments, S.A. (doravante Rioforte) –, por clientes não institucionais do BES, aos balcões do próprio BES (conforme resulta do próprio texto do CONTRATO).

### 27.º

Desse modo, tão pouco a Autora ESFG estava a assumir uma dívida própria, mas sim a prestar uma garantia pessoal por dívidas alheias.

### 28.º

O CONTRATO foi subscrito, em nome do BES, pelos administradores Joaquim Goes e Amílcar Morais Pires, em nome da Autora ESFG, pelos administradores José Manuel Espírito Santo Silva e Ricardo Espírito Santo Salgado e, em nome da Autora Partran, pelos administradores Pedro Beauvillain Brito e Cunha e Ricardo Espírito Santo Salgado (**Doc. n.º 4**).

### 29.º

Realce-se que Ricardo Espírito Santo Salgado subscreveu o CONTRATO quer na qualidade de representante da Autora ESFG, quer na qualidade de representante da Autora Partran.

14/72


PLMJ
SOCIEDADE DE ADVOGADOS, RL
A.M.PEREIRA, SÁRAGGA LEAL, OLIVEIRA MARTINS, JÚDICE
E ASSOCIADOS

**30.º**

À data da celebração do CONTRATO, Ricardo Espírito Santo Salgado e Pedro Beauvillain Brito e Cunha eram administradores da Autora Partran (**Doc. n.º 1**).

**31.º**

À data da celebração do CONTRATO, Pedro Beauvillain Brito e Cunha era administrador da Autora ESFG, a par dos referidos José Manuel Espírito Santo Silva e Ricardo Espírito Santo Salgado (**Doc. n.º 3**).

**32.º**

À data da celebração do CONTRATO, Ricardo Espírito Santo Salgado e José Manuel Espírito Santo Silva eram administradores do BES, a par dos referidos Joaquim Goes e Amílcar Morais Pires (conforme Certidão Permanente do Registo com o código de acesso n.º 3327-7858-6807, de que se junta cópia, como **Doc. n.º 5**).

**33.º**

Ricardo Espírito Santo Salgado e Pedro Beauvillain Brito e Cunha não obtiveram a prévia autorização do Conselho de Administração da Autora Partran – que não deliberou nesse sentido – para a constituição do PENHOR.

**34.º**

Ricardo Espírito Santo Salgado e Pedro Beauvillain Brito e Cunha não obtiveram o prévio parecer favorável do Conselho Fiscal da Autora Partran para a constituição do PENHOR.

**35.º**

As accionistas da Autora Partran não deliberaram autorizar a constituição do PENHOR, sendo que a Autora ESF(Portugal) nem sequer foi consultada sobre a matéria.

**B. Prejuízo para os credorès**

**36.º**

15/72


As acções da Tranquilidade são – como já o eram à data da constituição do PENHOR – o único activo relevante da Autora Partran (**Doc. n.º 2**, na página 12).

### 37.º

A Autora Partran detinha as seguintes dívidas perante fornecedores: EUR 11.562,00 (onze mil quinhentos e sessenta e dois Euros), perante a "Espírito Santo Resources Portugal, S.A."; EUR 9.840,00 (nove mil oitocentos e quarenta Euros), perante a "KPMG & Associados, Sociedade de Revisores Oficiais de Contas, S.A."; e EUR 20.295,00 (vinte mil duzentos e noventa e cinco Euros), perante "Amável Calhau, Ribeiro da Cunha e Associados, Sociedade de Revisores Oficiais de Contas, S.A." (**Docs. n.ºs 6, 7 e 8**).

### 38.º

A Autora Partran detém, desde 7 de Janeiro de 2005, uma dívida perante a Autora ESFG, sua accionista, por suprimentos, sendo o seu montante global, desde 15 de Março de 2011, de EUR 133.810.367,00 (cento e trinta e três milhões oitocentos e dez mil trezentos e sessenta e sete Euros) (**Doc. n.º 9**).

### 39.º

Em 10 de Outubro de 2014, o Tribunal de Comércio do Luxemburgo declarou a insolvência da Autora ESFG (**Doc. n.º 10**).

### 40.º

No processo de insolvência da Autora ESFG estão em causa créditos no montante global de cerca de EUR 1.343.950.000,00 (um bilião, trezentos e quarenta e três milhões novecentos e cinquenta mil Euros), sendo tal valor devido não apenas a investidores institucionais, mas também a investidores individuais (**Doc. n.º 11**).

### 41.º

No dia 27 de Outubro de 2014, a 1.ª Secção de Comércio da Instância Central da Comarca de Lisboa declarou a insolvência da Autora ESF(Portugal) (**Doc. n.º 12**).

### 42.º

No processo de insolvência da Autora ESF(Portugal), de acordo com a lista provisória de créditos anexa ao relatório a que alude o artigo 155º do Código da Insolvência e da Recuperação de Empresas, estão em causa créditos no montante global de EUR 337.229.294,01 (trezentos e trinta e sete milhões duzentos e vinte e nove mil duzentos e noventa e quatro Euros e um cêntimo) (**Doc. n.º 13**).

### 43.º

O PENHOR prejudica os credores da Autora Partran, seus fornecedores, diminuindo drasticamente a possibilidade de satisfação dos seus créditos.

### 44.º

O PENHOR prejudica igualmente de forma clara e drástica a Autora ESFG, não apenas enquanto accionista, mas sobretudo enquanto credora da Autora Partran, impossibilitando-a de obter a satisfação dos seus créditos sobre a Autora Partran.

### 45.º

O que, por sua vez, dada a situação de insolvência da Autora ESFG, prejudica os seus credores, sendo que uma parte desses credores são investidores individuais.

### 46.º

O PENHOR prejudica, por último a Autora ESF(Portugal), enquanto accionista da Autora Partran, e, indirectamente, dada a sua situação de insolvência, os seus credores.

### C. Dolo e má-fé

### 47.º

No dia 1 de Julho de 2014 realizou-se uma reunião do conselho de administração da Autora ESFG, no decurso da qual vários dos seus administradores manifestaram a sua oposição à constituição de penhores a favor do BES e sustentaram que tais penhores eram ilegais e prejudiciais para os credores (**Doc. n.º 14**).

### 48.º


PLMJ
SOCIEDADE DE ADVOGADOS, RL
A.M.PEREIRA, SÁRAGGA LEAL, OLIVEIRA MARTINS, JÚDICE
E ASSOCIADOS

Nessa reunião foi realçado que a Autora ESFG se encontrava numa situação financeira débil, com elevada probabilidade de incumprimento generalizado das suas obrigações (**Doc. n.º 14**).

### 49.º

Foi igualmente referido que a constituição de penhores constituiria uma utilização fraudulenta do património social, beneficiando o BES face aos demais credores (**Doc. n.º 14**).

### 50.º

Nesta reunião estiveram presentes Ricardo Espírito Santo Salgado, José Manuel Espírito Santo, Joaquim Goes e Pedro Beauvillain de Brito e Cunha (**Doc. n.º 14**).

### 51.º

No final da reunião não foi deliberada a constituição de penhores,

### 52.º

Mas sim e apenas a mera continuação de negociações com o Banco de Portugal com vista à constituição de penhores (**Doc. n.º 14**).

### 53.º

Face à necessidade de não tratar diferenciadamente os demais accionistas e os credores (**Doc. n.º 14**).

### 54.º

E mesmo esta deliberação apenas foi aprovada por maioria, pois obteve votos contra de três administradores da Autora ESFG (**Doc. n.º 14**).

### 55.º

Apesar do conteúdo da deliberação e, sobretudo, apesar das descritas advertências, Ricardo Espírito Santo Salgado, José Manuel Espírito Santo, Pedro Beauvillain de Brito e Cunha e Joaquim Goes assinaram o CONTRATO (**Doc. n.º 4**).

### 56.º

18/72


Ricardo Espírito Santo Salgado, José Manuel Espírito Santo Silva, Pedro Beauvillain Brito e Cunha, Joaquim Goes e Amílcar Morais Pires assinaram o CONTRATO, do qual consta a CLÁUSULA DE PENHOR, com a intenção de favorecer o BES e determinadas *holdings* da denominada "Família Espírito Santo" – a ESI e a Rioforte –, em detrimento dos credores da Autora Partran e dos credores da Autora ESFG e da Autora ESF(Portugal).

### 57.º

Ricardo Espírito Santo Salgado, José Manuel Espírito Santo Silva, Pedro Beauvillain Brito e Cunha, Joaquim Goes e Amílcar Morais Pires assinaram o CONTRATO, do qual consta a CLÁUSULA DE PENHOR, com consciência do prejuízo que causava aos credores da Autora Partran e aos credores da Autora ESFG e da Autora ESF(Portugal).

### 58.º

Acrescente-se que, nas semanas anteriores à constituição do PENHOR, vários colaboradores internos e externos da Autora ESFG chamaram a atenção dos seus administradores, que eram simultaneamente administradores do BES e da Autora Partran, para os problemas financeiros da Autora ESFG e para a ilegalidade da constituição de penhores e de garantias a dívidas alheias, em prejuízo dos credores.

Vejamos:

### 59.º

No dia 10 de Abril de 2014, Filipe Worsdell, Director Financeiro da Autora ESFG, enviou um email a Ricardo Espírito Santo Salgado, referindo, entre outras coisas, que a utilização da Tranquilidade para pagamento de dívidas alheias, sem receber qualquer preço, seria prejudicial para os credores (**Doc. n.º 15**).

### 60.º

No dia 25 de Abril de 2014, o Dr. Hoss, advogado luxemburguês da ESI, alertou para as graves irregularidades das demonstrações financeiras da ESI (**Doc. n.º 16**).

### 61.º

# 19/72


PLMJ
SOCIEDADE DE ADVOGADOS, RL
A.M.PEREIRA, SÁRAGGA LEAL, OLIVEIRA MARTINS, JÚDICE
E ASSOCIADOS

O que levou a que se questionasse se a prestação de garantias para pagamento de dívidas da ESI seria conforme com a lei (Doc. n.º 16).

### 62.º

Fazendo com que a sociedade de advogados Linklaters, através do seu departamento do Luxemburgo, tivesse que modificar o teor de um parecer jurídico favorável à prestação dessas garantias... (Doc. n.º 16)

### 63.º

No dia 4 de Junho de 2014, Roger Hartmann, Administrador Executivo da Autora ESFG, enviou uma carta a Ricardo Espírito Santo Salgado, referindo, entre outras coisas, que a constituição de novos penhores geraria o risco de reacção dos credores, que impugnariam a sua constituição (Doc. n.º 17).

### 64.º

No dia 10 de Junho de 2014, Filipe Worsdell, Director Financeiro da Autora ESFG, enviou uma carta a Ricardo Espírito Santo Salgado, chamando a atenção para os fortes constrangimentos financeiros da Autora ESFG e das suas subsidiárias, quer ao nível da capacidade para pagamento das dívidas que brevemente se venceriam, quer ao nível da capacidade de obtenção de financiamento (Doc. n.º 18).

### 65.º

No dia 23 de Junho de 2014, Tom Loesch, advogado luxemburguês contratado pelos Administradores Independentes da Autora ESFG que integravam a sua Comissão de Auditoria, emitiu um parecer jurídico, advertindo para o risco de responsabilidade criminal, com referência expressa à prestação de penhores e de garantias injustificados, em favorecimento de credores (ou do accionista maioritário) e com prejuízo para os demais credores (ou para os accionistas minoritários) (Doc. n.º 19).

### 66.º

No dia 26 de Junho de 2014, Filipe Worsdell, Director Financeiro da Autora ESFG, enviou uma carta a Ricardo Espírito Santo Salgado, demitindo-se das suas funções (Doc. n.º 20).


22

**67.º**

Nesta carta, Filipe Worsdell chamou a atenção para o dramático aumento da dívida consolidada da Autora ESFG (**Doc. n.º 20**).

**68.º**

E referiu que a constituição de penhores a favor de um único credor prejudicava os demais credores (**Doc. n.º 20**).

**69.º**

Em 27 de Junho de 2014, a sociedade de advogados Linklaters, através do seu departamento do Luxemburgo, voltou a reformular o teor do parecer jurídico favorável à prestação de garantias, sendo que, desta vez, já chamou a atenção para o risco de desvio de património social (*"misuse of corporate assets"*)... (**Doc. n.º 21**)

**70.º**

Acrescente-se que, ao longo do ano de 2014, a situação financeira da Autora ESFG se veio cada vez mais a debilitar, com um aumento significativo da sua dívida consolidada,

**71.º**

E que, em finais de Junho de 2014, a Autora ESFG já se encontrava em situação de incumprimento da sua dívida consolidada e sem condições expectáveis de reposição da sua situação financeira (**Doc. n.º 22**, com destaque para a página 6).

**72.º**

Pelo que era muito provável que viesse no futuro a ter lugar o incumprimento da dívida garantida.

**73.º**

Sendo igualmente muito provável que viesse no futuro a ter lugar a execução do PENHOR.

**74.º**

O que de facto veio a acontecer.

21/72

**75.º**

De notar ainda que, em simultâneo com a constituição do PENHOR, houve um alargamento da garantia da Autora ESFG, que passou a ser responsável não apenas por dívidas da ESI perante os clientes do BES, mas também por dívidas da Rioforte perante os clientes do BES (**Doc. n.º 4**).

**76.º**

Ou seja, em plena crise financeira e de liquidez da Autora ESFG, foi alargada a extensão da garantia perante os clientes do BES.

**77.º**

Dessa forma aumentando fortemente a probabilidade de incumprimento da dívida garantida e, consequentemente, a probabilidade de execução do PENHOR.

**78.º**

Mais: alguns dos administradores executivos chegaram ao ponto de elaborar uma acta do Conselho de Administração da Autora ESFG, com data de 24 de Junho de 2014, supostamente aprovando a constituição do PENHOR, e de a remeter ao Banco de Portugal (**Docs. n.º 23, 24, 25, 26, 27, 28 e 29**).

**79.º**

Entre esses Administradores estava Ricardo Espírito Santo, ele próprio Administrador do BES.

**80.º**

Acontece que, na reunião do Conselho de Administração da Autora ESFG efectivamente realizada no dia 24 de Junho de 2014 não foi adoptada qualquer deliberação sobre a constituição do PENHOR (como resulta claramente da acta original, que se junta como **Doc. n.º 30**).

**81.º**

Mais ainda: na reunião do Conselho de Administração da Autora ESFG realizada no dia 10 de Julho de 2014, um dos administradores perguntou a Ricardo Espírito Santo Salgado se os penhores, entre

22/72



PLMJ
SOCIEDADE DE ADVOGADOS, RL
A.M.PEREIRA, SÁRAGGA LEAL, OLIVEIRA MARTINS, JÚDICE E ASSOCIADOS

os quais constava o PENHOR em apreço, já tinham sido constituídos, tendo este respondido que estavam ainda em processo de ser constituídos (**Docs. n.º 31 e 32**).

### 82.º

O que indicia que o CONTRATO, através do qual foi constituído o PENHOR, terá sido celebrado após 10 de Julho de 2014, sendo a data nele aposta incorrecta.

### 83.º

Todos estes factos demonstram que a intenção de favorecer o BES e determinadas _holdings_ da denominada "Família Espírito Santo" – a ESI e a Rioforte –, em detrimento dos credores das Autoras, foi particularmente intensa.

### 84.º

Sintomaticamente, face às pressões internas e aos riscos de responsabilização, em reunião ocorrida no dia 14 de Julho de 2014, os administradores da Autora ESFG deliberaram, por unanimidade, "cancelar imediatamente todas as garantias e os penhores em favor do BES e contestar qualquer acto que entretanto os tivesse aprovado" (**Doc. n.º 33**).

### 85.º

Ricardo Espírito Santo Salgado, José Manuel Espírito Santo Silva, Joaquim Goes e Amílcar Morais Pires sabiam que o PENHOR era prejudicial para a Autora Partran, pois onerava o seu único activo, sem qualquer contrapartida.

### 86.º

Ricardo Espírito Santo Salgado, José Manuel Espírito Santo Silva, Joaquim Goes e Amílcar Morais Pires, caso tivessem analisado a operação com o mínimo de diligência, não poderiam deixar de perceber que o PENHOR era prejudicial para a Autora Partran, pois onerava o seu património, sem qualquer contrapartida.

### 87.º

23/72


PLMJ
SOCIEDADE DE ADVOGADOS, RL

A.M.PEREIRA, SÁRAGGA LEAL, OLIVEIRA MARTINS, JÚDICE
E ASSOCIADOS

Ricardo Espírito Santo Salgado, José Manuel Espírito Santo Silva, Joaquim Goes e Amílcar Morais Pires sabiam que o PENHOR não se enquadrava no objecto social da Autora Partran, pois consistia na prestação de uma garantia a uma sociedade não participada.

### 88.º

Ricardo Espírito Santo Salgado, José Manuel Espírito Santo Silva, Joaquim Goes e Amílcar Morais Pires, caso tivessem analisado a operação com o mínimo de diligência, não poderiam deixar de perceber que a prestação de garantias a sociedades não participadas não se enquadra na actividade de gestão de participações sociais e que, consequentemente, o PENHOR não se enquadrava no objecto social da Autora Partran.

### D. Transmissão do penhor

### 89.º

O Banco de Portugal, em reunião extraordinária do seu Conselho de Administração, realizada no dia 3 de Agosto de 2014, adoptou uma medida de resolução (doravante MEDIDA DE RESOLUÇÃO), determinando a constituição do Réu Novo Banco e a transferência para este banco de "todos os activos, licenças e direitos, incluindo direitos de propriedade do BES" (**Doc. n.º 34**).

### 90.º

O que significa que o PENHOR, por ser um activo do BES, foi transferido para o Réu Novo Banco.

### E. Execução do penhor e operação ESAF

### 91.º

Entretanto, desde inícios de 2014, corriam negociações com o Grupo Apollo, por si e através da sua subsidiária, a Ré Calm Eagle Holdings, S.à.r.l. (doravante Calm Eagle), com vista à compra e venda das acções da Tranquilidade.

### 92.º

Em 23 de Maio de 2014, o Grupo Apollo ofereceu um preço não vinculativo (na gíria, uma *non-binding offer*) de 228 milhões de Euros pelas acções da Tranquilidade, sujeito a correcções,

# 24/72


PLMJ
SOCIEDADE DE ADVOGADOS, RL

A.M.PEREIRA, SÁRAGGA LEAL, OLIVEIRA MARTINS, JÚDICE
E ASSOCIADOS

decorrentes de uma análise minuciosa do valor dos activos da Tranquilidade (na gíria, uma *due diligence*).

### 93.º

No dia 30 de Maio de 2014, em pleno curso das negociações para a venda da Tranquilidade, o BES vendeu à Tranquilidade acções representativas de 10% do capital social da ESAF – Espírito Santo Activos Financeiros, S.G.P.S., S.A. (doravante ESAF), por 29,7 milhões de Euros.

### 94.º

Tendo sido logo acordado que esta venda seria temporária, devendo o BES recomprar à Tranquilidade as acções da ESAF (**Doc. n.º 35**, na página 3).

### 95.º

O que deveria acontecer pelo mesmo valor.

### 96.º

O que mais não evidencia que esta operação foi acordada com a intenção de financiar e atribuir liquidez ao BES, fazendo entrar nos seus cofres 29,7 milhões de Euros.

### 97.º

Em prejuízo dos interesses da Tranquilidade, que na altura já estava com escassez de liquidez e em pleno processo de venda.

### 98.º

O BES não podia de resto deixar de saber que tal operação mais não fazia que esconder um financiamento à liquidez ao BES.

### 99.º

Na sequência da constituição do PENHOR e da MEDIDA DE RESOLUÇÃO, o Réu Novo Banco passou ele a prosseguir as negociações com a Apollo e a Ré Calm Eagle, sua subsidiária, com vista à venda das acções da Tranquilidade e a, desse modo, executar o PENHOR.

25/72



**100.º**

Sendo que, por força da MEDIDA DE RESOLUÇÃO, também foram transferidas do BES para o Réu Novo Banco quer a sua participação social maioritária no capital social da ESAF, quer o acordo com a Tranquilidade quanto a recompra das acções representativas de 10% do capital social da ESAF.

**101.º**

A análise mais detalhada do valor dos activos da Tranquilidade (a *due diligence*) terá revelado aparentemente que as acções da ESAF apenas valiam 16 milhões de Euros.

**102.º**

Pelo que a operação de venda das acções da ESAF não só atribuiu ao BES liquidez, como locupletou o BES em, pelo menos, 13,7 milhões de Euros.

**103.º**

O que, por sua vez, beneficiou o BES e, após a Medida de Resolução, o Réu Novo Banco em igual montante.

**104.º**

Provocando na Tranquilidade, e indirectamente nas Autoras, não só perda de liquidez, mas também um prejuízo de, pelo menos, 13,7 milhões de Euros.

**105.º**

Quando então a Tranquilidade já se encontrava em incumprimento do mínimo legal das denominadas provisões técnicas ou matemáticas que servem de cobertura aos riscos segurados.

**106.º**

Ou seja, quando a Tranquilidade já necessitava de ser recapitalizada, para poder continuar a sua actividade social de seguradora.

**107.º**

Sendo que todos estes prejuízos gerados com a operação ESAF se reflectiram negativamente no preço a obter pela Tranquilidade.

26/72


PLMJ
SOCIEDADE DE ADVOGADOS, RL
A.M.PEREIRA, SÁRAGGA LEAL, OLIVEIRA MARTINS, JÚDICE
E ASSOCIADOS

**108.º**

Descoberta esta situação sobre a participação ESAF, numa primeira evolução das negociações entre o Réu Novo Banco e a Ré Calm Eagle, o preço a pagar pela aquisição da Tranquilidade foi reduzido em 13 milhões de Euros.

**109.º**

Numa segunda evolução das negociações, o Réu Novo Banco combinou com a Ré Calm Eagle que o preço inicial de aquisição da Tranquilidade seria abatido em 29 milhões de Euros, sendo atribuído ao Réu Novo Banco o direito a adquirir as acções da ESAF, caso quisesse,

**110.º**

Sendo que, caso o Réu Novo Banco optasse por adquirir as acções da ESAF, o produto da venda dessas acções ao Réu Novo Banco iria, num primeiro fluxo financeiro, para a Ré Calm Eagle, via Tranquilidade, a título de preço, e regressaria, num segundo fluxo financeiro, ao Réu Novo Banco, a título de contrapartida pela execução do Penhor.

**111.º**

A Tranquilidade também era titular de acções representativas de 55% do capital social da ES Contact Center – Gestão de Call Centers, S.A. (doravante Contact), avaliadas contabilisticamente em 6 milhões de Euros.

**112.º**

No que respeita à situação da Contact, o Réu Novo Banco combinou com a Ré Calm Eagle que o preço inicial de aquisição da Tranquilidade seria abatido em 6 milhões de Euros, comprometendo-se a Ré Calm Eagle a posteriormente leiloar as acções da Contact e a entregar ao Réu Novo Banco, a título de contrapartida da execução do Penhor, o produto da venda em leilão das acções da Contact.

**113.º**

No dia 12 de Setembro de 2014, o Réu Novo Banco e a Ré Calm Eagle celebraram um acordo escrito (doravante CONTRATO DE EXECUÇÃO DO PENHOR), denominado "*Share Purchase and Sale*

27/72


*Agreement*", no qual se consignou, na sua cláusula 2., que, dependendo de certas condições, o Réu Novo Banco, na sua capacidade de credor pignoratício, vende à Ré Calm Eagle e esta compra as acções da Tranquilidade.

### 114.º

Estipulou-se, na cláusula 3.1., que, na data de execução ("closing"), a Ré Calm Eagle pagaria ao Réu Novo Banco a quantia de 25 milhões de Euros em numerário.

### 115.º

Estabeleceu-se, na cláusula 3.2., que as partes irão cooperar entre si para leiloar as acções da Contact e que, logo após a venda destas acções, a Ré Calm Eagle pagará ao Réu Novo Banco o valor equivalente ao produto da venda das acções.

### 116.º

Consignou-se, na cláusula 3.3., que o Réu Novo Banco poderá exigir à Ré Calm Eagle que venda as acções da ESAF ao Réu Novo Banco ou a uma pessoa por ele designada, contra o pagamento do montante resultante de uma avaliação, e que, logo após a venda destas acções, a Ré Calm Eagle pagará ao Réu Novo Banco o valor equivalente ao produto da venda das acções.

### 117.º

Estipulou-se, na cláusula 3.4., que, caso não sejam consumadas até determinadas datas quer a alienação das acções da Contact, quer a alienação das acções da ESAF, então, para efeitos do CONTRATO DE EXECUÇÃO DO PENHOR, o seu preço será equivalente a zero.

### 118.º

Consignou-se, na cláusula 4.1.1., que o contrato era celebrado sob condição suspensiva da não oposição pelo Instituto de Seguros de Portugal.

### 119.º

A titularidade das acções da Tranquilidade encontrava-se registada a favor da Autora Partran na conta de registo de acções n.º 0006.9680.0180, junto do Réu Novo Banco (**Doc. n.º 36**).

28/72


SOCIEDADE DE ADVOGADOS, RL

A.M.PEREIRA, SÁRAGGA LEAL, OLIVEIRA MARTINS, JÚDICE
E ASSOCIADOS

**120.º**

No dia 15 de Janeiro de 2015, sem instruções nesse sentido da Autora Partran, o Réu Novo Banco movimentou esta conta, transferindo a titularidade das acções da Tranquilidade para a Ré Calm Eagle (**Doc. n.º 36**).

**121.º**

No dia 15 de Janeiro de 2015, o Réu Novo Banco recebeu da Ré Calm Eagle a quantia de 25 milhões de Euros, em execução do PENHOR.

**122.º**

O processo tendente à venda das acções da Tranquilidade não foi aberto a todos os possíveis concorrentes.

**123.º**

A realização de um concurso fechado limita a procura, pelo que tende a provocar uma diminuição do preço oferecido.

**124.º**

Após passar a liderar as negociações, executando o PENHOR, o Réu Novo Banco não abriu o processo tendente à venda das acções da Tranquilidade a todos os possíveis concorrentes.

**125.º**

Após passar a liderar as negociações com a Ré Calm Eagle, o Réu Novo Banco aceitou vários abatimentos ao preço inicialmente proposto.

**126.º**

O Réu Novo Banco executou o PENHOR sem previamente proceder a uma avaliação da Tranquilidade.

**127.º**

O Réu Novo Banco executou o PENHOR sem garantir que o valor total da Tranquilidade, com todos os seus activos, fosse recebido imediatamente,


**128.º**

Tendo aceitado o protelamento do pagamento das componentes do preço relativas aos activos ESAF e Contact.

**129.º**

No dia 15 de Janeiro de 2015, a Tranquilidade tinha um valor superior ao preço efectivamente pago pela Ré Calm Eagle.

**F. Má-fé do adquirente do bem penhorado**

**130.º**

Por carta datada de 22 de Agosto de 2014, a Autora ESFG notificou a Apollo, que tem como subsidiária a Ré Calm Eagle, de que considerava o PENHOR nulo (**Doc. n.º 37**).

**131.º**

Por comunicados difundidos através do sistema de divulgação de informação da Comissão do Mercado de Valores Mobiliários, em 29 de Agosto de 2014 e 18 de Setembro de 2014, a Autora ESFG informou que considerava o PENHOR ilegal (**Docs. n.ºs 38 e 39**).

**132.º**

O Venerando Tribunal da Relação de Lisboa, por acórdão proferido em 17 de Dezembro de 2014, no âmbito do processo n.º 1286/14.9TVLSB, julgou o contrato constitutivo do PENHOR nulo (**Doc. n.º 40**).

**133.º**

A Ré Calm Eagle teve conhecimento do teor integral deste acórdão em momento anterior a 15 de Janeiro de 2015.

**III. DO DIREITO**

**A. Nulidade do penhor por violação do artigo 19.º do Regime Jurídico dos**

30/72

22


**Acordos de Garantia Financeira – *Acto fraudulento contra credores***

### 134.º

O PENHOR deve ser qualificado como um penhor financeiro, para efeitos do artigo 2.º, n.º 2, do Decreto-Lei n.º 105/2004, de 8 de Maio (Regime Jurídico dos Acordos de Garantia Financeira, doravante RJAGF).

### 135.º

Sobre o penhor financeiro, veja-se RUI PINTO DUARTE, *Curso de direitos reais*, 3.ª edição, Estoril, Principia, 2013, pp. 266-271, ANTÓNIO MENEZES CORDEIRO, *Direito bancário*, 5.ª edição, Coimbra, Almedina, 2014, pp. 815-819 e 823-825, JOÃO CALVÃO DA SILVA, *Banca, bolsa e seguros – Direito europeu e português*, I, 2.ª edição, Coimbra, Almedina, 2007, pp. 205-236, LUÍS PESTANA DE VASCONCELOS, *Direito das garantias*, 2.ª edição, Coimbra, Almedina, 2015, pp. 291-320, e MARGARIDA COSTA ANDRADE, "O penhor financeiro com direito de disposição de valores mobiliários", *Revista da Ordem dos Advogados*, ano 70, 2010, vol. I/IV.

### 136.º

O contrato constitutivo do PENHOR foi praticado intencionalmente em detrimento de outros credores, nos termos do artigo 19.º do RJAGF.

### 137.º

Refira-se que a melhor doutrina, ao interpretar este artigo 19.º do RJAGF, convoca a noção civilística de má-fé (assim, ANTÓNIO MENEZES CORDEIRO, *Direito bancário*, 5.ª edição, Coimbra, Almedina, 2014, p. 824).

### 138.º

A má fé corresponde à consciência do prejuízo que o acto causa ao credor.

### 139.º

De acordo com esta doutrina, para efeitos de aplicação do artigo 19.º do RJAGF, bastaria a prova de que o contrato constitutivo do PENHOR foi praticado com consciência do prejuízo que causa aos credores das Autoras.

31/72

23


**140.º**

Todavia, no caso em apreço é por demais evidente que não só existiu consciência do prejuízo que causa aos credores das Autoras (má-fé), como existiu intenção manifesta de favorecer o BES e determinadas *holdings* da denominada "Família Espírito Santo" – a ESI e a Rioforte –, em prejuízo dos credores das Autoras (dolo).

**141.º**

Inclusivamente, os factos relatados até permitem concluir que o dolo foi particularmente intenso, na medida em que os subscritores do CONTRATO:

- desconsideraram várias advertências, entre as quais um parecer jurídico independente,

- sabiam que a Autora ESFG já se encontrava em incumprimento da sua dívida consolidada,

- e actuaram em desconformidade com o decidido pelo Conselho de Administração da Autora ESFG,

- tendo chegado ao ponto de elaborar uma acta do Conselho de Administração da Autora ESFG em desconformidade com o deliberado

- e havendo indícios de terem aposto no CONTRATO uma data incorrecta.

**142.º**

O contrato constitutivo do PENHOR é nulo, por força do disposto no artigo 19.º do RJAGF e nos artigos 281.º e 294.º do Código Civil.

**143.º**

O Venerando Tribunal da Relação de Lisboa, no âmbito do processo n.º 1286/14.9TVLSB, já teve a oportunidade de apreciar a validade do contrato constitutivo do PENHOR, tendo referido, na página 20 do seu Acórdão, de forma certeira e lapidar, que se trata de um acto em favorecimento de determinados credores em detrimento de outros, em violação do princípio fundamental da *par conditio creditorum* (**Doc. n.º 40**).

    B. *Segue:* **Imputação do dolo e da má-fé dos representantes às pessoas colectivas**

32/72


**144.º**

Como se deixou claramente alegado, os subscritores do CONTRATO actuaram com dolo (intenção de favorecer um credor em detrimento dos demais credores) e má-fé (consciência do prejuízo para os demais credores).

**145.º**

Por mera cautela de patrocínio, para a hipótese de não se provar que *todos* os representantes actuaram com dolo e má-fé, passamos a sustentar que basta o dolo ou a má-fé de apenas *um* dos representantes.

Vejamos:

**146.º**

Estamos perante o problema jurídico da imputação de estados subjectivos dos representantes às pessoas colectivas.

**147.º**

As pessoas colectivas são criações humanas sem corpo ou mente, que não têm estados subjectivos, como o dolo (intenção de favorecer e prejudicar) ou a má fé (consciência de prejudicar), pelo qué é necessário apurar em que circunstâncias os estados subjectivos dos seus representantes lhes são imputáveis.

**148.º**

A matéria da imputação dos estados subjectivos na representação é tratada no artigo 259.º, n.º 1, do Código Civil, donde se estrai a regra de que "*é na pessoa do representante que deve verificar-se (...) o conhecimento ou ignorância dos factos que podem influir nos efeitos do negócio*".

**149.º**

*Quid iuris* se o representado, como acontece quase sempre com as pessoas colectivas, tem mais do que um representante? Basta o dolo ou a má-fé de um único representante?

**150.º**

33/72


PLMJ
SOCIEDADE DE ADVOGADOS, RL
A.M. PEREIRA, SÁRAGGA LEAL, OLIVEIRA MARTINS, JÚDICE
E ASSOCIADOS

A reflexão doutrinária nacional sobre este problema jurídico é escassa, sendo que um olhar para a doutrina alemã oferece conclusões lapidares:

### 151.º

Basta o dolo ou a má-fé de um dos representantes que actuaram na celebração do negócio jurídico (veja-se HANS-JOACHIM MERTENS e ANDREAS CAHN, *Kölner Kommentar zum Aktiengesetz*, 3.ª edição, Colónia, Heymanns, 2010, § 76, Rn. 86, e WOLFGANG HEFERMEHL e GERALD SPINDLER, *Münchener Kommentar zum Aktiengesetz*, 2.ª edição, Munique, Beck/Vahlen, 2004, § 78, Rn. 79).

### 152.º

O principal argumento decorre do princípio da igualdade, a saber:

### 153.º

As pessoas colectivas não podem ser tratadas de forma privilegiada face aos seres humanos, beneficiando de um regime laxista de imputação do dolo, da má fé ou de outros estados subjectivos (apontando este argumento, MATHIAS HABERSACK, *Grosskommentar zum Aktiengesetz*, 4.ª edição, Berlim, de Gruyter, 2003, § 78, Rn. 25).

### 154.º

Ora, a regra de que basta o dolo ou má-fé de um único administrador é a que melhor se conforma com a letra do artigo 259.º, n.º 1, do Código Civil.

### 155.º

E é também a única interpretação conforme ao princípio da igualdade, consagrado no artigo 13.º da Constituição da República Portuguesa, pelo que desde já se invoca, para todos os efeitos, a inconstitucionalidade de uma interpretação normativa diversa.

### 156.º

Voltando ao caso em apreço, reitera-se que basta a verificação do dolo ou da má-fé em apenas um dos administradores, realçando-se que o dolo e a má-fé são particularmente evidentes e intensos na pessoa do então Presidente da Comissão Executiva do BES e dos Conselhos de Administração da Autora ESFG e da Autora Partran.

34/72


### C. Nulidade do penhor por violação do artigo 5.º, n.º 1, alínea c), do Regime Jurídico das Sociedades Gestoras de Participações Sociais – *Proibição de concessão de crédito pelas SGPS*

#### 157.º

O PENHOR viola o artigo 5.º, n.º 1, alínea c), do Decreto-Lei n.º 495/88, de 30 de Dezembro (Regime Jurídico das Sociedades Gestoras de Participações Sociais, doravante RJSGPS).

#### 158.º

Que proíbe a concessão de crédito pelas sociedades gestoras de participações sociais nomeadamente aos seus sócios.

#### 159.º

Esta proibição de concessão de crédito deve ser interpretada no sentido de abranger a concessão de garantias, em conformidade com o conceito de concessão de crédito adoptado no artigo 4.º, n.º 1, alínea b), do Decreto-Lei n.º 298/92, de 31 de Dezembro (Regime Geral das Instituições de Crédito e Sociedades Financeiras).

#### 160.º

Joga-se o imperativo de interpretação sistemática da lei.

#### 161.º

Está igualmente em causa a necessidade de interpretação teleológica da lei, pois pretende-se proibir a ajuda das Sociedades Gestoras de Participações Sociais aos seus accionistas quer directamente, pela concessão de empréstimos, quer indirectamente, por meio da prestação de garantia aos terceiros financiadores.

#### 162.º

Veja-se CARLOS OSÓRIO DE CASTRO e DIOGO LORENA DE BRITO, "A concessão de crédito por uma SGPS às sociedades estrangeiras por ela dominadas (ou às sociedades nacionais indirectamente dominadas através de uma sociedade estrangeira) e o artigo 481.º, n.º 2, do C.S.C.", *O Direito*, ano

35/72



PLMJ
SOCIEDADE DE ADVOGADOS, RL
A.M.PEREIRA, SÁRAGGA LEAL, OLIVEIRA MARTINS, JÚDICE E ASSOCIADOS

136, 2004, I, p. 136, e João Marcelo Ferreira Cristóvão, *Garantias Prestadas por Sociedades Comerciais a Obrigações de Sociedades Coligadas*, p. 85, dissertação de mestrado disponível em http://run.unl.pt/bitstream/10362/6832/1/Cristovao_2011.PDF.

### 163.º

Pelo que o contrato constitutivo do Penhor é nulo, ao abrigo do disposto no artigo 5.º, n.º 1, alínea c), do RJSGPS e do artigo 294.º do Código Civil.

### 164.º

Esta mesma conclusão foi adoptada pelo Venerando Tribunal da Relação de Lisboa, no âmbito do referido processo n.º 1286/14.9TVLSB, ao apreciar a validade do contrato constitutivo do Penhor (**Doc. n.º 40**).

> **D.  Nulidade do penhor por violação dos artigos 4.º, n.º 1, alínea b), e 8.º, n.º 2, do Regime Geral das Instituições de Crédito e Sociedades Financeiras – *Operações bancárias***

### 165.º

O Penhor ofende os artigos 4.º, n.º 1, alínea b), e 8.º, n.º 2, do Decreto-Lei n.º 298/92, de 31 de Dezembro (Regime Geral das Instituições de Crédito e Sociedades Financeiras, doravante RGICSF).

### 166.º

Que atribuem, em exclusivo, aos bancos a capacidade para efectuar operações de crédito, nelas englobando a concessão de garantias.

### 167.º

Na doutrina, veja-se Alexandre de Soveral Martins, *in* Jorge Coutinho de Abreu (Coordenação), *Código das Sociedades Comerciais em Comentário*, vol. I, Coimbra, Almedina, 2010, p. 115, nota 21, e Carlos Osório de Castro e Diogo Lorena de Brito, "A concessão de crédito por uma SGPS às sociedades estrangeiras por ela dominadas (ou às sociedades nacionais indirectamente

36/72


dominadas através de uma sociedade estrangeira) e o artigo 481.º, n.º 2, do C.S.C.", *O Direito*, ano 136, 2004, I, p. 136, nota 22.

### 168.º

Repare-se que o PENHOR, para além de se traduzir em si mesmo numa garantia, mais não foi que uma forma de prestação indirecta de financiamento (prestação de garantia com vista à prestação de financiamento), pelo que colide duplamente com a proibição do RGICSF.

### 169.º

Pelo que o contrato constitutivo do PENHOR é nulo, por força do disposto nos artigos 4.º, n.º 1, alínea b), e 8.º, n.º 2, do RGICSF e no artigo 294.º do Código Civil.

### 170.º

Esta conclusão também foi adoptada pelo Venerando Tribunal da Relação de Lisboa, no âmbito do referido processo n.º 1286/14.9TVLSB (**Doc. n.º 40**).

### E. Nulidade do penhor por violação do artigo 6.º, n.º 1 e n.º 3, do Código das Sociedades Comerciais – *Princípio da especialidade*

### 171.º

O contrato constitutivo do PENHOR traduz-se na prestação pela Autora Partran de uma garantia real a favor de terceiros, convocando o disposto no artigo 6.º, n.º 1 e n.º 3, do Código das Sociedades Comerciais, que consagra o chamado *princípio da especialidade*.

### 172.º

A parte final do n.º 3 do artigo 6.º –"*salvo (...) se se tratar de sociedade em relação de domínio ou de grupo*" – excepciona as situações de prestação de garantias a sociedades em relação de domínio ou de grupo.

### 173.º

37/72


Contudo, o âmbito de aplicação deste normativo é delimitado pelo artigo 481.º, n.º 2, do Código das Sociedades Comerciais, restringindo-se aos grupos formados por sociedades com sede em Portugal.

## 174.º

Neste sentido, CATARINA TAVARES LOUREIRO e JOANA TORRES EREIO, "A relação de domínio ou de grupo como pressuposto de facto para a aplicação das normas do Código das Sociedades Comerciais – o âmbito espacial em particular", *Actualidad Jurídica Uría Menéndez*, n.º 30, 2011, p. 57, em http://www.uria.com/documentos/publicaciones/3223/documento/art05.pdf?id=3371.

## 175.º

Acresce, como argumentação subsidiária, que a parte final do n.º 3 do artigo 6.º apenas possibilita a prestação de garantias pela sociedade dominante a favor da sociedade dependente, não admitindo a prestação de garantias pela sociedade dependente a favor da sociedade dominante.

## 176.º

Neste sentido, JORGE COUTINHO DE ABREU, *Curso de direito comercial*, vol. II, 4ª edição, Coimbra, Almedina, 2011, pp. 202-207, ALEXANDRE DE SOVERAL MARTINS, *in* JORGE COUTINHO DE ABREU (Coordenação), *Código das Sociedades Comerciais em Comentário*, vol. I, Coimbra, Almedina, 2010, pp. 117-118, e CARLOS OSÓRIO DE CASTRO, "De novo sobre a prestação de garantias por sociedades a dívidas de outras entidades: luzes e sombras", *Revista da Ordem dos Advogados*, 1998, pp. 854-855.

## 177.º

Pelo que a Autora Partran não podia prestar uma garantia no interesse da Autora ESFG.

## 178.º

O n.º 3 do artigo 6.º do Código das Sociedades Comerciais excepciona também as situações em que existe "*justificado interesse próprio da sociedade garante*".

## 179.º

38/72


Ora, no caso em apreço, estamos perante uma garantia gratuita, sem qualquer contrapartida para a Autora Partran, o que permite concluir que não existe qualquer justificado interesse próprio.

### 180.º

Acresce que, à data de constituição do PENHOR, a Autora ESFG já se encontrava em situação de incumprimento, que era muito provável a execução do PENHOR e que a execução do PENHOR levaria a própria Autora Partran a uma situação de insolvência.

### 181.º

Pelo que é verdadeiramente inconcebível considerar que existia um justificado interesse próprio da Autora Partran na prestação do PENHOR.

### 182.º

Esta é uma situação de manifesta inexistência de justificado interesse próprio da sociedade garante, equiparável às analisadas no Acórdão do Tribunal da Relação de Lisboa de 29 de Junho de 2010, processo n.º 3257/06.0TBOER-A.L1-1, no Acórdão do Tribunal da Relação de Lisboa de 30 de Junho de 2011, processo n.º 14818/07.0YYLSB-A.L1-7, ambos disponíveis em www.dgsi.pt, e no recente Acórdão do Tribunal da Relação de Coimbra de 10 de Fevereiro de 2015, processo n.º 1453/13.2TBFIG-B.C1 (de que se junta cópia, como **Doc. n.º 41**).

### 183.º

Pelo que o contrato constitutivo do PENHOR é nulo, ao abrigo do disposto no artigo 6.º, n.º 1 e n.º 3, do Código das Sociedades Comerciais e do artigo 294.º do Código Civil.

### 184.º

Sendo, de novo, de realçar que o Venerando Tribunal da Relação de Lisboa, no âmbito do referido processo n.º 1286/14.9TVLSB, também chegou a esta conclusão, tendo consignado que a Partran, ora Autora, não tinha qualquer justificado interesse próprio na constituição do PENHOR (**Doc. n.º 40**).

F. **Nulidade do penhor por violação do artigo 397.º, n.º 2, do Código das Sociedades Comerciais (ou anulabilidade por violação do artigo 261.º, n.º 1, do Código Civil)** – *Negócio consigo mesmo*

39/72


### 185.º

O contrato constitutivo do PENHOR foi subscrito por Ricardo Espírito Santo Salgado simultaneamente na qualidade de representante da Autora ESFG e de representante da Autora Partran.

### 186.º

Pelo que estamos perante um negócio consigo mesmo, na modalidade de dupla representação.

### 187.º

Na dupla representação, a mesma pessoa actua em representação de ambas as partes no negócio jurídico.

### 188.º

Na dupla representação, tal como nas outras modalidades de negócio consigo mesmo, existe um risco de preterição dos interesses do representado tão elevado, que o legislador opta por afectar a eficácia dos negócios jurídicos sem exigir a prova de um efetivo prejuízo para o representado (como explicam, há muito, INOCÊNCIO GALVÃO TELLES, «Contrato entre a sociedade anónima e o seu director», *O Direito*, 1955, pp. 14-17, e ADRIANO VAZ SERRA, «Contrato consigo mesmo», *RLJ*, ano 91, 1958, p. 180, na esteira da Doutrina germânica, sendo este enquadramento unânime na Doutrina nacional).

### 189.º

A dupla representação não se encontra prevista na letra do artigo 397.º, n.º 2, do Código das Sociedades Comerciais.

### 190.º

Todavia, o artigo 397.º, n.º 2, do Código das Sociedades Comerciais deve ser aplicado por analogia às situações de dupla representação.

### 191.º

Como referem JOSÉ FERREIRA GOMES, «Conflito de interesses entre accionistas nos negócios celebrados entre a sociedade anónima e o seu accionista controlador», *Conflito de interesses no*

40/72


*direito financeiro e societário: um balanço a partir da crise financeira*, Coimbra, Almedina, 2010, pp. 103-106, PEDRO CAETANO NUNES, «Jurisprudência sobre o dever de lealdade dos administradores», *II Congresso Direito das Sociedades em Revista*, Coimbra, Almedina, 2012, p. 201, e, no âmbito da legislação anterior, INOCÊNCIO GALVÃO TELLES, «Contrato entre a sociedade anónima e o seu director», *O Direito*, 1955, p. 21, e ADRIANO VAZ SERRA, «Contrato consigo mesmo e negociação de directores ou gerentes de sociedades anónimas ou por quotas com as respectivas sociedades», *RLJ*, ano 100, 1967.

### 192.º

A aplicação analógica do artigo 397.º, n.º 2, do Código das Sociedades Comerciais às situações de dupla representação tem acolhimento na jurisprudência, nomeadamente no Acórdão do Tribunal da Relação de Évora de 19 de Junho de 2008, publicado em www.dgsi.pt, processo n.º 521/08-2.

### 193.º

Pelo que o contrato constitutivo do PENHOR é nulo, ao abrigo do disposto no artigo 397.º, n.º 2, do Código das Sociedades Comerciais.

### 194.º

Por mera cautela de patrocínio, para a hipótese de se entender que não é aplicável, por analogia, o artigo 397.º, n.º 2, do Código das Sociedades Comerciais, então será aplicável o artigo 261.º, n.º 1, do Código Civil, com a sanção da anulabilidade, sanção essa que a Autora Partran invoca, a título subsidiário.

**G. Ineficácia do penhor ao abrigo do artigo 269.º do Código Civil – *Abuso da representação***

### 195.º

O contrato constitutivo do PENHOR foi celebrado em abuso da representação, para efeitos do artigo 269.º do Código Civil.

### 196.º

41/72


O regime do abuso da representação, previsto no artigo 269.º do Código Civil, é aplicável à representação de sociedades comerciais, conforme entendimento doutrinário e jurisprudencial pacífico.

### 197.º

Na doutrina, entre outros: RAÚL VENTURA, *Sociedades por quotas*, III, Coimbra, Almedina, 1991, pp. 175-176, CARLOS FERREIRA DE ALMEIDA, *Contratos*, I, 5ª edição, Coimbra, Almedina, 2013, pp. 165-166, e JOSÉ ENGRÁCIA ANTUNES, "O abuso de representação como limite aos poderes dos gerentes", *Estudos em homenagem ao Prof. Doutor José Lebre de Freitas*, Coimbra, Coimbra Editora, 2013, pp. 265-315.

### 198.º

Na jurisprudência merece destaque o Acórdão do Supremo Tribunal de Justiça de 27 de Fevereiro de 2014, disponível em www.dgsi.pt, proc. n.º 1835/07.9TBOA7.P1.S1.

### 199.º

O artigo 269.º do Código Civil tem como pressupostos o abuso do representante e o conhecimento ou dever de conhecimento do abuso pelo terceiro.

### 200.º

Sobre os pressupostos do abuso da representação, veja-se, entre outros, CARLOS FERREIRA DE ALMEIDA, *Contratos*, I, 5ª edição, Coimbra, Almedina, 2013, pp. 163-166, ANTÓNIO MENEZES CORDEIRO, *Tratado de direito civil português*, I, tomo IV, Coimbra, Almedina, 2005, pp. 111-113, e CARLOS ALBERTO DA MOTA PINTO, ANTÓNIO PINTO MONTEIRO e PAULO MOTA PINTO, *Teoria geral do direito civil*, 4ª edição, Coimbra, Almedina, 2005, p. 550.

### 201.º

Uma das situações típicas de abuso é a actuação contra o interesse do representado.

### 202.º

42/72



Ora, no caso em apreço, os representantes da Autora Partran actuaram em manifesta violação dos seus deveres de cuidado e de lealdade, prosseguindo interesses opostos aos da Autora Partran e dos seus credores (conforme artigo 64.º, n.º 1, do Código das Sociedades Comerciais).

**203.º**

O prosseguimento de interesses opostos aos da Autora Partran e dos seus credores é notório, dado que o crédito garantido não foi constituído para satisfazer quaisquer necessidades ou interesses da Autora Partran, mas antes de terceiros.

**204.º**

Acresce que, como se referiu, à data de constituição do PENHOR, a Autora ESFG já se encontrava em situação de incumprimento, pelo que era muito provável a execução do PENHOR e a colocação da Autora Partran numa situação de insolvência.

**205.º**

Relativamente ao conhecimento ou dever de conhecimento pelo terceiro, temos que não só se alegou que os representantes do BES sabiam que o contrato constitutivo do PENHOR era prejudicial para a Autora Partran,

**206.º**

Como, subsidiariamente, se alegou que os representantes do BES não podiam deixar de saber, actuando com um mínimo de diligência, que o contrato constitutivo do PENHOR era prejudicial para a Autora Partran.

**207.º**

Retoma-se aqui a referência ao problema da imputação de estados subjectivos às pessoas colectivas, realçando que basta a verificação do conhecimento ou do dever de conhecimento em apenas um dos administradores.

**208.º**

Neste último contexto, acrescente-se que o conhecimento de que o contrato constitutivo do PENHOR era prejudicial para a Autora Partran é particularmente evidente na pessoa do então Presidente da

43/72


PLMJ
SOCIEDADE DE ADVOGADOS, RL
A.M. PEREIRA, SÁRAGGA LEAL, OLIVEIRA MARTINS, JÚDICE
E ASSOCIADOS

Comissão Executiva do BES.

### 209.º

Pelo que se conclui pela ineficácia do contrato constitutivo do PENHOR, por força do disposto nos artigos 269.º e 268.º, n.º 1, do Código Civil

### H. Ineficácia do penhor ao abrigo do artigo 409.º, n.º 2, do Código das Sociedades Comerciais – *Actuação que extravasa o objecto social*

### 210.º

O contrato constitutivo do PENHOR não vincula a Autora Partran, por força do disposto no artigo 409.º, n.º 2, do Código das Sociedades Comerciais.

### 211.º

O artigo 409.º, n.º 2, do Código das Sociedades Comerciais tem como pressupostos uma actuação que extravasa o objecto social e o conhecimento ou dever de conhecimento desse facto pelo terceiro.

### 212.º

Sobre este regime, entre outros, ALEXANDRE DE SOVERAL MARTINS, *in* JORGE COUTINHO DE ABREU (Coordenação), *Código das Sociedades Comerciais em Comentário*, vol. VI, Coimbra, Almedina, 2013, pp. 480-484, e ANTÓNIO MENEZES CORDEIRO, *Código das Sociedades Comerciais anotado*, 2ª edição, Coimbra, Almedina, 2011, p. 1081.

### 213.º

Quanto ao primeiro pressuposto – actuação que extravasa o objecto social –, temos que a Autora Partran é uma sociedade gestora de participações sociais, que tem por objecto social a gestão de participações sociais noutras sociedades, como forma indirecta de exercício de actividades económicas,

### 214.º

Sendo que a constituição do PENHOR não é instrumental face à prossecução deste objecto social.

44/72


**215.º**

Mais: como tivemos a oportunidade de referir, a prestação de garantias por sociedades gestoras de participações sociais a sociedades não participadas até é proibida por lei.

**216.º**

Relativamente ao segundo pressuposto – conhecimento ou dever de conhecimento pelo terceiro –, temos que não só se alegou que os representantes do BES sabiam que se extravasava o objecto social da Autora Partran,

**217.º**

Como, subsidiariamente, se alegou que os representantes do BES não podiam deixar de saber, actuando com um mínimo de diligência, que se extravasava o objecto social da Autora Partran.

**218.º**

Também aqui se retoma a referência ao problema da imputação de estados subjectivos às pessoas colectivas, reiterando que basta a verificação do conhecimento ou do dever de conhecimento em apenas um dos administradores.

**219.º**

Acrescenta-se que o conhecimento de que o contrato constitutivo do PENHOR não era instrumental face ao objecto social da Autora Partran é particularmente evidente na pessoa do então Presidente da Comissão Executiva do BES.

**220.º**

A sanção jurídica aplicável é a da ineficácia, pois está em causa uma sub-espécie do abuso da representação (veja-se, entre outros, CARLOS FERREIRA DE ALMEIDA, *Contratos*, I, 5ª edição, Coimbra, Almedina, 2013, p. 165, e ALEXANDRE DE SOVERAL MARTINS, *in* JORGE COUTINHO DE ABREU (Coordenação), *Código das Sociedades Comerciais em Comentário*, vol. VI, Coimbra, Almedina, 2013, p. 484).

**221.º**


Pelo que se conclui pela ineficácia do contrato constitutivo do PENHOR, ao abrigo do artigo 409.º, n.º 2, do Código das Sociedades Comerciais.

I. **Nulidade, anulabilidade e ineficácia. Restituição em espécie ou restituição do valor. Indemnização**

**222.º**

As nulidades são invocáveis por qualquer interessado, nos termos do artigo 286.º do Código Civil, sendo que todas as Autoras tem particular interesse na invocação destas nulidades (confirme-se também o disposto no artigo 605.º do Código Civil).

**223.º**

Ao abrigo do artigo 287.º, n.º 1, do Código Civil, a Autora Partran tem legitimidade para arguir a anulabilidade prevista no artigo 261.º, n.º 1, do Código Civil, pois é a pessoa no interesse da qual a mesma foi estabelecida.

**224.º**

A Autora Partran tem legitimidade para arguir as ineficácias jurídicas previstas no artigo 269.º do Código Civil e no artigo 409.º, n.º 2, do Código das Sociedades Comerciais, pois é a pessoa no interesse da qual as mesmas foram estabelecidas.

**225.º**

Por força do disposto no artigo 289.º do Código Civil, a declaração de nulidade, a anulação e a declaração de ineficácia têm efeito retroactivo, implicando a restituição de tudo o que tiver sido prestado ou, se a restituição em espécie não for possível, o valor correspondente.

**226.º**

As sanções de nulidade, anulabilidade e ineficácia incidem sobre o contrato de penhor, que tem como partes a Autora Partran, na qualidade de empenhador, e o BES (entretanto substituído pelo Réu Novo Banco), na qualidade de credor pignoratício.

**227.º**


PLMJ
SOCIEDADE DE ADVOGADOS, RL

A.M.PEREIRA, SÁRAGGA LEAL, OLIVEIRA MARTINS, JÚDICE
E ASSOCIADOS

Este contrato de penhor é corporizado na cláusula 16.ª (CLÁUSULA DE PENHOR) do escrito denominado "*Aditamento e reformalização de Contrato de Depósito em Garantia e de Financiamento*" e datado de 2 de Julho de 2014 (CONTRATO).

### 228.º

A inclusão física do contrato de penhor num escrito mais amplo não destrói a sua autonomia jurídica, enquanto contrato legalmente típico, que tem como partes o empenhador e o credor pignoratício.

### 229.º

Por mera cautela de patrocínio, para a hipótese de se entender que o contrato de penhor não tem autonomia jurídica, sendo um mero componente de um contrato mais vasto, celebrado pelo BES, pela Autora ESFG e pela Autora Partran – o referido CONTRATO –, sustenta-se, a título subsidiário, que as sanções de nulidade, anulabilidade e ineficácia não poderão deixar de incidir sobre o CONTRATO.

### 230.º

O CONTRATO DE EXECUÇÃO DO PENHOR é nulo, por força de uma nulidade sequencial, ao abrigo do próprio artigo 289.º do Código Civil.

### 231.º

É igualmente correcto considerar que o CONTRATO DE EXECUÇÃO DO PENHOR é nulo, por força do disposto no artigo 892.º do Código Civil, pois constitui uma venda de bens alheios.

### 232.º

Para além de nulo, o CONTRATO DE EXECUÇÃO DO PENHOR é ineficaz em relação à Autora Partran, enquanto titular legítima das acções da Tranquilidade, como bem esclarecem, entre outros, FERNANDO PIRES DE LIMA e JOÃO ANTUNES VARELA, *Código Civil anotado*, II, 3ª edição, Coimbra, Coimbra Editora, 1986, p. 189, e MANUEL CARNEIRO DA FRADA, *in* ANTÓNIO MENEZES CORDEIRO (Coordenação), *Direito das obrigações*, III, 2ª edição, Lisboa, AAFDL, 1991, p. 53.

### 233.º

47/72



Os direitos da Ré Calm Eagle, enquanto terceiro, não merecem tutela, dado que a mesma estava de má-fé (confirme-se o disposto nos artigos 291.º e 892.º do Código Civil e no artigo 58.º do Código dos Valores Mobiliários).

### 234.º
A Autora Partran tem direito à restituição em espécie das acções da Tranquilidade, ao abrigo dos artigos 289.º e 1311.º do Código Civil, devendo ambos os Réus ser condenados na sua entrega.

### 235.º
Entre os efeitos da declaração de nulidade avulta o cancelamento do registo de aquisição das acções da Tranquilidade a favor da Ré Calm Eagle (confirme-se o disposto no artigo 76.º do Código dos Valores Mobiliários) e a reconstituição do registo de aquisição a favor da Autora Partran, sem a oneração do penhor.

### 236.º
Caso não seja possível obter a restituição em espécie das acções da Tranquilidade, a Autora Partran tem direito ao seu valor, nos termos do já mencionado artigo 289.º do Código Civil.

### 237.º
Pelo que, a título subsidiário face à restituição em espécie, o Réu Novo Banco deve ser condenado no pagamento à Autora Partran do valor correspondente às acções da Tranquilidade.

### 238.º
No caso de não ser possível obter a restituição em espécie das acções da Tranquilidade, a Ré Calm Eagle também deve ser condenada no pagamento à Autora Partran do valor correspondente às acções da Tranquilidade, ao abrigo do artigo 483.º (ofensa ao direito de propriedade) e do artigo 334º (ofensa dolosa contra os bons costumes), ambos do Código Civil.

### 239.º
A Autora Partan desconhece neste momento qual o exacto valor das acções da Tranquilidade, pelo que remete a sua liquidação para momento posterior.

48/72


PLMJ
SOCIEDADE DE ADVOGADOS, RL

A.M. PEREIRA, SÁRAGGA LEAL, OLIVEIRA MARTINS, JÚDICE
E ASSOCIADOS

### J. Operação ESAF: execução do penhor com violação de deveres de lealdade e de diligência; enriquecimento sem causa

#### 240.º

Quer a restituição em espécie das acções da Tranquilidade, quer a restituição do seu valor, ambas possibilitadas pelo mencionado artigo 289.º do Código Civil, não permitem acautelar totalmente os interesses da Autora Partran e dos seus credores.

#### 241.º

Daí que, em cumulação quer com o pedido de restituição em espécie das acções da Tranquilidade, quer com o pedido de condenação no pagamento do valor das mesmas, se peticione a condenação do Réu Novo Banco no pagamento à Autora Partran de uma indemnização.

#### 242.º

A base factual para este pedido indemnizatório reside na operação de venda pelo BES das acções da ESAF e no posterior enquadramento das acções da ESAF na execução do PENHOR pelo Réu Novo Banco.

#### 243.º

A fundamentação jurídica para este pedido indemnizatório reside na violação de deveres de lealdade e de diligência na execução do PENHOR e, enquanto causa de pedir subsidiária, no enriquecimento sem causa.

Vejamos:

#### 244.º

No âmbito da relação jurídica entre o empenhador e o credor pignoratício, a execução extraprocessual do penhor, prevista no artigo 675.º do Código Civil, determina o surgimento na esfera jurídica do credor pignoratício de determinados deveres de diligência e de lealdade.

#### 245.º

Parte da doutrina fundamenta estes deveres de diligência e de lealdade na regra de conduta da boa fé, servindo de exemplo LUÍS PESTANA DE VASCONCELOS, *Direito das garantías*, 2.ª edição, Coimbra,



PLMJ
SOCIEDADE DE ADVOGADOS, RL
A.M. PEREIRA, SÁRAGGA LEAL, OLIVEIRA MARTINS, JÚDICE
E ASSOCIADOS

Almedina, 2015, p. 254, TIAGO SOARES DA FONSECA, *O penhor de acções*, Coimbra, Almedina, 2005, pp. 116-117, e, aparentemente, CATARINA MONTEIRO PIRES, "A execução extraprocessual do penhor – os casos particulares dos penhores de acções e de quotas", *O Direito*, ano 142.º, 2010, III, pp. 557-558 e 561.

### 246.º

Outra parte da doutrina sustenta que estes deveres de diligência e de lealdade são extremamente intensos, suplantando as exigências da regra de conduta da boa fé.

### 247.º

Enquadrando-os numa relação jurídica de especial confiança – uma relação fiduciária *lato sensu* –, servindo de exemplo MANUEL CARNEIRO DA FRADA, *Teoria da confiança e responsabilidade civil*, Coimbra, Almedina, 2004, pp. 544-559, e PEDRO CAETANO NUNES, "Jurisprudência sobre o dever de lealdade dos administradores", *II Congresso Direito das Sociedades em Revista*, Coimbra, Almedina, 2012, pp. 184-187 (veja-se ainda a referência à *Ermächtigungstreuhand* em PEDRO PAIS DE VASCONCELOS, *Contratos atípicos*, Coimbra, Almedina, 2002, p. 256).

### 248.º

Porquê este enquadramento numa relação fiduciária?

### 249.º

Porque a execução extraprocessual do penhor implica a atribuição ao credor pignoratício de um poder de disposição sobre uma coisa alheia não apenas no seu interesse, mas também no interesse do empenhador.

### 250.º

Sendo que existe o risco de o credor pignoratício abusar do seu poder, exercendo-o no seu exclusivo interesse pessoal e em prejuízo do empenhador.

### 251.º

Há, portanto, uma desproporção entre meios e fins e um risco de abuso de poder.

50/72



**252.º**

Sendo que a única forma de acautelar os interesses do empenhador consiste na imposição ao credor pignoratício de deveres de diligência e de lealdade particularmente intensos.

**253.º**

Estes deveres fiduciários de diligência e de lealdade decorrem do próprio artigo 675.º do Código Civil, pois considera-se que a atribuição de poderes fiduciários de disposição implica a sujeição do fiduciário aos correspondentes deveres.

**254.º**

Dado que o Réu Novo Banco actuava igualmente na qualidade de intermediário financeiro perante a Autora Partran, pois as acções da Tranquilidade encontravam-se depositadas numa conta de registo de acções junto do Réu Novo Banco, os referidos deveres fiduciários de diligência e de lealdade também resultam do artigo 304.º, n.º 2, do Código dos Valores Mobiliários.

**255.º**

Para quem prefira reconduzir estes deveres de diligência e de lealdade à boa fé, a sua base legal residirá nos artigos 227.º e 762.º, n.º 2, do Código Civil.

**256.º**

Estes deveres, quer se baseiem no artigo 675.º do Código Civil, quer resultem do artigo 304.º, n.º 2, do Código dos Valores Mobiliários, quer decorram artigos 227.º e 762.º, n.º 2, do Código Civil persistem ainda que o contrato de penhor seja nulo, anulável ou ineficaz.

**257.º**

Voltando ao caso em apreço, temos que os deveres de diligência e de lealdade impunham que o Réu Novo Banco tivesse recomprado as acções da ESAF à Tranquilidade, pelo valor da venda inicial, antes de concluir a venda da Tranquilidade, de forma a não prejudicar a Autora Partran.

**258.º**

Pelo que o Réu Novo Banco deverá indemnizar a Autora Partran, nos termos do artigo 798.º do Código Civil, por violação dos seus deveres de diligência e de lealdade na execução do PENHOR.

51/72

 

PLMJ
SOCIEDADE DE ADVOGADOS, RL
A.M.PEREIRA, SÁRAGGA LEAL, OLIVEIRA MARTINS, JÚDICE
E ASSOCIADOS

**259.º**

O dano corresponde à diferença entre o valor de venda das acções da ESAF pelo BES à Tranquilidade – 29,7 milhões de Euros – e o valor efectivo das mesmas à data dessa venda.

**260.º**

Caso não seja possível a restituição em espécie das acções da Tranquilidade, mantendo-se em vigor o CONTRATO DE EXECUÇÃO DO PENHOR, então o dano corresponderá à diferença entre o valor de venda das acções da ESAF pelo BES à Tranquilidade – 29,7 milhões de Euros – e o valor efectivamente imputado a estas acções no preço do CONTRATO DE EXECUÇÃO DO PENHOR.

**261.º**

Como causa de pedir subsidiária, a Autora Partran tem direito a estas mesmas quantias ao abrigo das regras do enriquecimento sem causa, consagradas nos artigos 473.º e seguintes do Código Civil.

**262.º**

A Autora Partran desconhece neste momento qual o exacto valor destas quantias, pelo que remete a sua liquidação para momento posterior.

**K. Execução defeituosa do penhor**

**263.º**

Em caso de improcedência dos pedidos de declaração de nulidade, anulação e declaração de ineficácia do contrato de penhor, a Autora Partran vem, por mera cautela de patrocínio, pedir uma indemnização por violação dos deveres de diligência e de lealdade na execução do PENHOR.

**264.º**

Como base legal para este pedido invoca-se o referido artigo 675.º do Código Civil, o apontado artigo 304.º, n.º 2, do Código dos Valores Mobiliários e o mencionado artigo 762.º, n.º 2, do Código Civil.

44


**265.º**

Os referidos deveres de diligência e de lealdade impunham que o Réu Novo Banco abrisse o processo de venda a todos os possíveis adquirentes, para não provocar um efeito de diminuição do preço das acções da Tranquilidade, em prejuízo da Autora Partran.

**266.º**

Ou, no mínimo, que avaliasse previamente o valor das acções da Tranquilidade, para não as vender por um preço inferior.

**267.º**

Os referidos deveres de diligência e de lealdade impunham também que o Réu Novo Banco tivesse exigido à Ré Calm Eagle o pagamento imediato de todas as componentes do preço.

**268.º**

Referindo expressamente que, ao executar o penhor, o credor pignoratício não deve vender a coisa sem imediato pagamento do preço, sob pena de ter que indemnizar o empenhador, ADRIANO VAZ SERRA, *Penhor. Penhor de coisas – Penhor de direitos*, separata do Boletim do Ministério da Justiça, 1956, pp. 244-246.

**269.º**

O Réu Novo Banco violou ostensivamente este dever, tendo permitido o deferimento do pagamento das componentes do preço relativas aos activos ESAF e Contact.

**270.º**

Sendo que estas componentes constituem uma parte substancial do preço total.

**271.º**

Pelo que, subsidiariamente face a todos os pedidos anteriores, o Réu Novo Banco deverá indemnizar a Autora Partran, ao abrigo do artigo 798.º do Código Civil, por violação dos seus deveres de diligência e de lealdade na execução do PENHOR.

**272.º**

53/72


O dano corresponde à diferença entre o preço obtido imediatamente pela venda das acções da Tranquilidade – 25 milhões de Euros – e o valor que obteria caso tivesse aberto o processo de venda a todos os possíveis adquirentes e exigido o pagamento imediato de todas as componentes do preço.

### 273.º

A Autora Partan desconhece neste momento qual o exacto valor deste dano, pelo que remete a sua liquidação para momento posterior.

### 274.º

O pedido de indemnização deste dano é cumulado com o pedido relativo à operação ESAF.

### 275.º

Ou seja, os referidos deveres de diligência e de lealdade impunham também que o Réu Novo Banco tivesse recomprado as acções da ESAF à Tranquilidade antes de concluir a venda da Tranquilidade, de forma a não prejudicar a Autora Partran.

### 276.º

Aqui o dano corresponde à diferença entre o valor de venda das acções da ESAF pelo BES à Tranquilidade – 29,7 milhões de Euros – e o valor efectivamente imputado a estas acções no preço do CONTRATO DE EXECUÇÃO DO PENHOR.

### 277.º

A Autora Partan desconhece neste momento qual o exacto valor deste dano, pelo que remete a sua liquidação para momento posterior.

IV.     PEDIDO

Pelo exposto, o Tribunal deve:

    I. Como pedido principal:

        a)     Declarar a nulidade do contrato de penhor constante da Cláusula 16.ª (CLÁUSULA DE PENHOR) do contrato celebrado pelo Banco


Espírito Santo, S.A., pela Autora ESFG e pela Autora Partran, datado de 2 de Julho de 2014 (o CONTRATO);

b) Subsidiariamente face ao pedido formulado em a), anular o contrato de penhor constante da Cláusula 16.ª (CLÁUSULA DE PENHOR);

c) Subsidiariamente face aos pedidos formulados em a) e b), declarar a ineficácia do contrato de penhor constante da Cláusula 16.ª (CLÁUSULA DE PENHOR);

II. Subsidiariamente face aos pedidos I.a), I.b) ou I.c):

d) Declarar a nulidade do contrato celebrado pelo Banco Espírito Santo, S.A., pela Autora ESFG e pela Autora Partran, datado de 2 de Julho de 2014 (o CONTRATO);

e) Subsidiariamente face ao pedido formulado em d), anular o CONTRATO;

f) Subsidiariamente face aos pedidos formulados em d) e e), declarar a ineficácia do CONTRATO;

III. Em cumulação com todos os pedidos anteriores:

g) Declarar a nulidade do contrato celebrado no dia 12 de Setembro de 2014, pelo Réu Novo Banco e pela Ré Calm Eagle, através do qual foram transmitidas as acções da Companhia de Seguros Tranquilidade, S.A. (CONTRATO DE EXECUÇÃO DO PENHOR);

h) Subsidiariamente face ao pedido formulado em g), declarar a ineficácia do CONTRATO DE EXECUÇÃO DO PENHOR;

IV. Em cumulação com todos os pedidos anteriores:

i) Condenar os Réus Novo Banco e Calm Eagle na restituição à Autora Partran das acções da Companhia de Seguros Tranquilidade, S.A.;

j) Determinar o cancelamento do registo de aquisição das acções da Companhia de Seguros Tranquilidade, S.A. a favor da Ré Calm Eagle;

55/72



k) Determinar a reconstituição do registo de aquisição das acções da Companhia de Seguros Tranquilidade, S.A. a favor da Autora Partran, sem a oneração do penhor;

**V.** Também em cumulação com todos os pedidos anteriores:

l) Condenar o Réu Novo Banco no pagamento à Autora Partran da diferença entre o preço de venda das acções da ESAF – Espírito Santo Activos Financeiros, S.G.P.S., S.A. pelo Banco Espírito Santo, S.A. à Companhia de Seguros Tranquilidade, S.A. – 29,7 milhões de Euros – e o valor efectivo das mesmas à data da venda, a liquidar em momento posterior;

**VI.** Em cumulação com os pedidos I.a), I.b), I.c), II.d), II.e) ou II.f) e subsidiariamente face aos pedidos III.h), III.i), IV.j), IV.k) e V.l):

m) Condenar o Réu Novo Banco e a Ré Calm Eagle no pagamento à Autora Partran do valor correspondente às acções da Companhia de Seguros Tranquilidade, S.A., a liquidar em momento posterior;

**VII.** Em cumulação com os pedidos I.a), I.b), I.c), II.d), II.e) ou II.f), subsidiariamente face aos pedidos III.g), III.h), IV.i), IV.j), IV.k) e V.l) e em cumulação com o pedido VI.m):

n) Condenar o Réu Novo Banco no pagamento à Autora Partran da diferença entre o preço de venda das acções da ESAF – Espírito Santo Activos Financeiros, S.G.P.S., S.A. pelo Banco Espírito Santo, S.A. à Companhia de Seguros Tranquilidade, S.A. – 29,7 milhões de Euros – e o valor efectivamente imputado a estas acções no preço do Contrato de Execução do Penhor, a liquidar em momento posterior;

**VIII.** Subsidiariamente face a todos os pedidos:

o) Condenar o Réu Novo Banco no pagamento à Autora Partran de uma indemnização, pela violação dos deveres de diligência e de

48


lealdade na execução do Contrato de Penhor, a liquidar em momento posterior;

IX. Subsidiariamente face aos pedidos I.a), I.b), I.c), II.d), II.e), II.f), III.g), III.h), IV.i), IV.j), IV.k), V.l), VI.m) e VII.n) e em cumulação com o pedido VIII.o):

    p)    Condenar o Réu Novo Banco no pagamento à Autora Partran da diferença entre o preço de venda das acções da ESAF – Espírito Santo Activos Financeiros, S.G.P.S., S.A. pelo Banco Espírito Santo, S.A. à Companhia de Seguros Tranquilidade, S.A. – 29,7 milhões de Euros – e o valor efectivamente imputado a estas acções no preço do Contrato de Execução do Penhor, a liquidar em momento posterior;

X. Em qualquer caso, condenar os Réus a liquidar as custas e o que mais de lei houver a pagar.

REQUERIMENTO PROBATÓRIO:

- Prova documental:

Nos termos do disposto no artigo 429.º do Código de Processo Civil, requer-se a notificação:

    a)    da Ré Calm Eagle para que proceda à junção da carta de 23 de Maio de 2014, elaborada pela Apollo, com uma oferta não vinculativa (non-binding offer) de 228 milhões de Euros pelas acções da Tranquilidade;

    b)    do Réu Novo Banco e da Ré Calm Eagle para que procedam à junção do contrato através do qual o BES vendeu à Tranquilidade acções representativas de 10% do capital social da ESAF – Espírito Santo Activos Financeiros, S.G.P.S., S.A.;

    c)    do Réu Novo Banco e da Ré Calm Eagle para que procedam à junção de toda a correspondência, incluindo a electrónica, relativa ao processo de - venda à Tranquilidade das acções representativas de 10% do capital social da ESAF – Espírito Santo Activos Financeiros, S.G.P.S., S.A. e ao posterior processo de revenda das mesmas acções;

57/72


PLMJ
SOCIEDADE DE ADVOGADOS, RL
A.M.PEREIRA, SÁRAGGA LEAL, OLIVEIRA MARTINS, JÚDICE
E ASSOCIADOS

d) do Réu Novo Banco e da Ré Calm Eagle para que procedam à junção de todas as gravações e eventuais transcrições das conferências telefónicas relativas ao processo de venda à Tranquilidade das acções representativas de 10% do capital social da ESAF – Espírito Santo Activos Financeiros, S.G.P.S., S.A. e ao posterior processo de revenda das mesmas acções

e) do Réu Novo Banco e da Ré Calm Eagle para que procedam à junção de todos os documentos relativos às deliberações sociais atinentes ao processo de venda à Tranquilidade das acções representativas de 10% do capital social da ESAF – Espírito Santo Activos Financeiros, S.G.P.S., S.A. e à posterior revenda das mesmas acções;

f) do Réu Novo Banco para que proceda à junção de toda a correspondência, incluindo a electrónica, trocada com o Banco de Portugal, relativa à venda à Tranquilidade das acções representativas de 10% do capital social da ESAF – Espírito Santo Activos Financeiros, S.G.P.S., S.A. e ao posterior processo de revenda das mesmas acções;

g) do Réu Novo Banco e da Ré Calm Eagle para que procedam à junção, na íntegra, do contrato, celebrado no dia 12 de Setembro de 2014, denominado "*Share Purchase and Sale Agreement*", através do qual o Réu Novo Banco, na sua capacidade de credor pignoratício, vendeu à Ré Calm Eagle e esta comprou as acções da Tranquilidade;

h) do Réu Novo Banco e da Ré Calm Eagle para que procedam à junção de toda a correspondência, incluindo a electrónica, relativa à negociação da estrutura de preço de venda das acções da Tranquilidade;

i) da Ré Calm Eagle para que proceda à junção do último extracto da conta onde tem inscrita a titularidade das acções da Tranquilidade;

**- Prova por confissão:**

Nos termos do disposto no artigo 452.º do Código de Processo Civil, requer-se o depoimento de parte de:

1. Eduardo Stock da Cunha, Presidente do Conselho de Administração do Réu Novo Banco, S.A., à matéria dos artigos 90.º, 93.º a 96.º, 99.º a 102.º, 104.º, 107.º a 121.º e 124.º a 128.º deste articulado, a notificar na sede social do Réu Novo Banco.

58/72

 

PLMJ
SOCIEDADE DE ADVOGADOS, RL
AM PEREIRA, SÁRAGGA LEAL, OLIVEIRA MARTINS, JÚDICE
E ASSOCIADOS

**- Prova por declarações de parte:**

Nos termos do disposto no artigo 466.º do Código de Processo Civil, requer-se a prestação de declarações de parte de:

1. Caetano Beirão da Veiga, Presidente do Conselho de Administração da Autora Partran, SGPS, S.A., à matéria dos artigos 18.º a 20.º, 22.º a 27.º, 33.º a 38.º e 43.º a 133.º deste articulado, a notificar na sede social da Autora Partran.

2. Laurence Jacques, Advogada, Liquidatária Judicial da Autora Espírito Santo Financial Group, S.A., com domicílio profissional em 35 Avenue Monterey, L-2163 Luxemburgo, à mesma matéria, a inquirir por <u>videoconferência</u>, ao abrigo do Regulamento n.º 1206/2001, do Conselho, de 28 de Maio de 2001;

3. Pedro Pidwell, Administrador da Insolvência da Autora Espírito Santo Financial (Portugal), SGPS, S.A., com domicílio profissional na Rua do Mercado, Bloco 3, 2.º Dt.º, Apartado 204, 3781-909 Anadia, à mesma matéria.

Caso qualquer dos citados venha a deixar de exercer as referidas funções, requer-se, desde já, a sua inquirição como testemunha.

**- Prova pericial:**

Nos termos do disposto nos artigos 467.º e seguintes do Código de Processo Civil, requer-se a produção de prova pericial colegial, tendo como objecto a matéria alegada nos artigos 93.º, 94.º, 95.º, 96.º, 97.º, 101.º, 102.º, 104.º, 105.º, 106.º, 107.º, 123.º e 129.º desta Petição Inicial.

Após admissão da produção de prova pericial, requer-se que as Autoras sejam notificadas para indicar um perito.

**- Prova testemunhal:**

Indicam-se como testemunhas:

1. Bernard Basecqz, com domicílio profissional em 1 Rue Plaetis, L-2338 Luxemburgo, a inquirir por <u>videoconferência</u>, ao abrigo do Regulamento n.º 1206/2001, do Conselho, de 28 de Maio de 2001;

2. Fernando Pereira Braga Pereira Coutinho, com domicílio profissional na Av. da Liberdade, n.º 195, 1250-142, Lisboa, requerendo a sua notificação ao abrigo do

51

artigo 507.º, n.º 2, do Código de Processo Civil;

3. Teresa de Souza, com domicílio profissional na Av. da Liberdade, n.º 195, 1250-142, Lisboa, requerendo a sua notificação ao abrigo do artigo 507.º, n.º 2, do Código de Processo Civil;

4. Filipe Worsdell, a apresentar;

5. Luís Costa Ferreira, com domicílio profissional na Rua do Comércio, n.º 148, 1100-148, Lisboa, requerendo a sua notificação ao abrigo do artigo 507.º, n.º 2, do Código de Processo Civil.

6. Pedro Miguel de Seabra Duarte Neves, Vice-Governador do Banco de Portugal, com domicílio profissional na Rua do Comércio, n.º 148, 1100-148, Lisboa, requerendo a sua notificação ao abrigo do artigo 507.º, n.º 2, do Código de Processo Civil.

7. Pedro Beauvillain Brito e Cunha, com domicílio profissional na Av. da Liberdade, n.º 242, 1250-149, Lisboa, requerendo a sua notificação ao abrigo do artigo 507.º, n.º 2, do Código de Processo Civil;

8. Gustavo Alexandre Pontes Teixeira de Mesquita Guimarães, com domicílio profissional na Av. da Liberdade, n.º 242, 1250-149, Lisboa, requerendo a sua notificação ao abrigo do artigo 507.º, n.º 2, do Código de Processo Civil.

VALOR DO PEDIDO: EUR 50.000,01

JUNTAM: 3 Procurações, 1 Substabelecimento, DUC e comprovativo do respectivo pagamento e 41 documentos.

Os Advogados,

NUNO LÍBANO MONTEIRO          MANUELA TAVARES MORAIS          PEDRO CAETANO NUNES

60/72